[No. A131366. First Dist., Div. Two. Oct. 29, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL LEE LEAL, Defendant and Appellant.

832

## Counsel

Donald L. Lipmanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Dorian Jung, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KLINE, P. J.**—This probation case presents recurring issues arising when a trial court considers imposing, consistent with the *Lent* test (*People v. Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545]), a condition of probation restricting medical use of marijuana under the Compassionate Use Act of 1996 (CUA) (Health & Saf. Code, § 11362.5) and the Medical Marijuana Program (MMP) (Health & Saf. Code, § 11362.7 et seq.).[1] Daniel Lee Leal challenges such a condition imposed on him. Finding that imposition of the condition was not an abuse of discretion, we shall affirm the judgment.

### Background

A jury found that Leal possessed marijuana for sale (§ 11359) while armed (Pen. Code, § 12022, subd. (a)(1)), plus three firearm offenses (Pen. Code, former §§ 12031, subd. (a)(1), 12021, subd. (c)(1), 12025, subd. (a)(2), (b)(6)), and resisting a peace officer (Pen. Code, § 148, subd. (a)(1)); the court granted him three years' formal probation, prohibiting him from all marijuana use, including medical use. Sentencing also disposed of a case arising while Leal was out on bail in the first case. The charge was also possessing marijuana for sale (§ 11359), this time with an enhancement for commission while on bail (Pen. Code, § 12022.1, subd. (b)). The facts of both cases were before the court when it imposed the no-marijuana condition.

### *The Current Case*

Trial evidence showed that, before noon on February 29, 2008, at Gentry-town Park in Antioch, undercover narcotics Detectives Michael Mortimer and Josh Vincelet were driving by in an unmarked truck when Leal jaywalked in front of them. This caused the officers and two other drivers to slow or swerve to avoid hitting him. Leal flipped off the officers and continued toward a park entrance, near a restroom. Mortimer made a U-turn and, against traffic, pulled up to the curb along a sidewalk where Leal was walking.

After alighting from their truck and identifying themselves, the officers called upon Leal to stop. Ignoring these requests, he stepped back and put his hands into the front pocket of his sweatshirt. Saying "fuck this," Leal then turned and ran into the park. Vincelet ran after him, still identifying himself and calling on Leal to stop, as Mortimer got back into the truck to follow. As the gap between them closed near the restroom, Vincelet saw Leal toss a

---

[1] All unspecified section references are to the Health and Safety Code.

small black handgun into a dirt patch between some bushes, and then slip on some wet·grass and fall, rolling onto his stomach. Vincelet was immediately on top of Leal and held him there until Mortimer arrived to help handcuff Leal.

From across the park where she and other parents tended to their children at a play structure, a woman who had earlier uneasily noted that Leal was "skulking around the bathroom area," watched the encounter with horror, fearing for her children's safety.

Alerted by Vincelet to the gun by the bushes, Mortimer retrieved it—a black .22-caliber semiautomatic with six live cartridges in the magazine. Leal's front sweatshirt pocket held a cell phone and 12 knot-tied plastic sandwich bags containing small amounts of marijuana. Other pockets held a digital gram scale, a $50 bill, cell phone batteries, and two "blunts" (cigars refilled at least in part with marijuana). Call logs on the phone showed several text messages in the inbox and outbox indicating drug sales, particularly people wanting to get "an eighth," a phrase connoting a weight of marijuana or other drugs. The phone rang throughout the officers' time at the park, and Vincelet's expert opinion was that the circumstances indicated possession for sale. An "eighth," he testified, was street parlance for an eighth of an ounce (about 3.5 grams). Most of the plastic bags held about eight grams of marijuana—two "eighths"—and there were 72.6 grams in all.

In a wallet, Leal had two marijuana cards—one authorizing him to possess marijuana, and the other a membership card from a marijuana dispensary in Berkeley. Vincelet testified that, in his experience, nearly 90 percent of arrestees in marijuana sales cases "possess either a marijuana patient's recommendation or a card."

### The New Case

The facts are set forth in a probation report that summarizes a police incident report. On October 14, 2009, Antioch police officers were searching a hydroponics supply store when Leal entered and inquired whether the store was still open. A detective in plain clothes but displaying a badge and wearing a gun, who recognized Leal from prior contacts, told him the store was closed. Leal explained that he had arranged with the owner of the store to purchase a grow lamp for $175, which he needed to expand his "grow." The detective asked Leal how many plants he was growing, and Leal told him he was growing 16 "lollypop buds."

Noticing a strong odor of marijuana coming from Leal, the detective identified himself as a police officer and asked Leal why he smelled like

marijuana. Leal responded by saying, "I can smoke weed. You can check me." After confirming that Leal was consenting to be searched, the officer conducted a search and found $965 in cash, separated in stacks of $100 and banded together with a rubberband, a baggie containing four small baggies, each containing approximately three grams of marijuana, and a small digital gram scale. When the officer opened a large baggie and extracted one of the smaller baggies it contained, Leal told him: "That's my personal sack. That's for me to smoke." When the officer extracted the remaining baggies, Leal said, "Them other ones are for business. I'm just trying to make my money." Leal then said, "It's all mine. I smoke a lot of weed. I smoke about an 8th every hour and a half." Leal also stated that he was "out on bail" for a robbery case and, anticipating he would be sentenced to jail, was "smoking as much weed as he can while he's out of custody."

The detective found a current medical marijuana card in his wallet, which Leal said he needed because his mother has cancer. When advised that his mother's illness was not a valid reason for his marijuana use, Leal "admitted that he loves to smoke 'weed.' " A search of Leal's cell phone revealed several text messages asking Leal for marijuana. The phone also contained several photos of Leal posing in front of a group of mature marijuana plants. When the officers arrested Leal, he told them that the money they found on him "was for grow equipment. It ain't from selling weed." The detective told Leal that he knew he was unemployed and had no legitimate source of income.

Leal was nearly 26 years old at sentencing, and a probation report for his jury-tried case stated: "Although [Leal] opted out of the interview process, his substance abuse issues are evident by his arrest history for possession of marijuana. He said that he has a cannabis card but his card will expire while he is in custody." Leal's criminal history, beyond the current and new cases, included misdemeanor assault as an adult, and second degree burglary and attempted robbery as a juvenile.

### Grant of Probation

At the commencement of the sentencing hearing, the court stated for the record a discussion in chambers: "The recommendation of the probation officer was probation on the case that was tried. And what we discussed is a global disposition of that case, along with the pre-preliminary hearing pending case, which the defendant picked up while he was out on bail on this case. And . . . the district attorney indicated that he would dismiss the [bail] enhancement if the defendant pleaded to Count 1, which is another 11359 as a felony.

"And . . . I would sentence him on the case that went to trial, on which we had the jury verdict, to 180 days in the county jail with three years of formal probation. And that if you wanted to dispose of the other case pre-preliminary and take early responsibility for that, I would make a total number of days of 270 days.

"And I also stated that I would require, as a condition of probation, that the defendant not use or possess any marijuana, even medical marijuana. We had a discussion in chambers about the legality of that. I told counsel I was quite sure there was a recent Court of Appeal decision on the issue, and pulled it up . . . and provided it to them. It's *People v. Brooks* [(2010) 182 Cal.App.4th 1348 [107 Cal.Rptr.3d 501]]. . . . And it held that just as the court has discretion in an appropriate case to impose probation conditions that prohibit even legal activity, there's no exception for medical marijuana to that rule. So, it stated the rule that as long as there's a nexus between the probation condition and the conduct at issue, that it is a legal condition of probation.

"And the reason I would—I find it to be related to that condition—related to the conduct at issue, is that the defendant in this case, and as I understand it both from our discussions in this case about [Evidence Code section] 1101(b) evidence and also our discussion in chambers, in this case and in the other case, he appears to be . . . selling marijuana on the side to fund his use of marijuana. And so there is a nexus between his use, even if authorized by a doctor, and the illegal conduct.

"And I do find that he is much more likely to engage in future criminal activity selling marijuana again if he is in possession of it for medical use. And so he's going to have to find some other way of medicating himself other than using marijuana. So that's what we discussed."

Defense counsel agreed with that summary but, before submitting the matter, objected to the condition notwithstanding *Brooks*, adding: "I would . . . simply augment the record by saying my client does have a diagnosis of hypertension and post-traumatic stress and that is what he uses marijuana to treat. The Court's observations about his use versus his sales, I—I think that the record in the case speaks for itself, but there was clear indication he was in possession of a medical marijuana card and that he had, in fact, user paraphernalia, and evidence that he had purchased marijuana from a local marijuana dispensary in Berkeley. I believe that was the evidence in the case."

The court added: "The other issue I probably should put on the record is my concern about his possession of a loaded weapon in connection with his possession of marijuana. It makes it a much more dangerous activity, and

there was some suggestion in the trial that he needed the gun to protect himself because he was possessing the marijuana. And, again, if that is his bent to possess a loaded weapon to protect his possession of marijuana, even if it's legal, I think that's yet another basis for a nexus between the condition that he not possess any marijuana and the crimes at issue in this case."

The court then accepted Leal's plea of no contest to the new marijuana possession-for-sale charge, dismissed the enhancement on the People's motion, and followed the indicated disposition. The court suspended imposition of sentence and placed Leal on three years' formal probation, imposing conditions that included: "You may not use, possess, or have in your custody or control any illegal drugs, narcotics, or narcotic paraphernalia, and that includes marijuana even with a marijuana card. So no marijuana for the next three years."

## DISCUSSION

Precedent has explored issues in cases like ours, where circumstances suggest to a sentencing court that a defendant would be rehabilitated by a probation condition banning marijuana possession and use, even as authorized by the CUA. Our division addressed some of those issues three years ago, in *People v. Moret* (2009) 180 Cal.App.4th 839 [104 Cal.Rptr.3d 1] (*Moret*), but produced three separate opinions that yielded agreement, by two, on only a single issue of waiver peculiar to the case. (*Id.* at pp. 844–848, 852 (lead opn. of Haerle, J.), 857–860 (conc. opn. of Richman, J.).)

■ We return to those issues and apply a three-step inquiry into limiting CUA use of marijuana by a probationer. First, we examine the validity of any CUA authorization; second, we apply the threshold *Lent* test for interfering with such authorization; and third, we consider competing policies governing the exercise of discretion to restrict CUA use. To assist us, we ordered supplemental briefing from the parties on these points: "(1) May a sentencing court invoke Health and Safety Code section 11362.795 on its own motion, or otherwise inquire into the validity of a defendant's right and need to use medical marijuana under the Compassionate Use Act (CUA) (Health & Saf. Code, § 11362.5)? (2) If the court determines that a defendant claiming such right and need has valid CUA authorization, yet finds a sufficient nexus to the defendant's offense or future criminality to restrict such usage under the *Lent* criteria (*People v. Lent*[, *supra*,] 15 Cal.3d 481, 486),what other factors, if any, should inform the court's discretion in deciding whether to impose such a condition?"

## I. *Step One—Validity of CUA Authorization*

Marijuana remains a schedule I controlled substance in California (§ 11054, subd. (d)(13)), unlawful to possess without CUA authorization (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 923 [70 Cal.Rptr.3d 382, 174 P.3d 200] (*Ross*)), and this ordinarily makes its possession prohibited by the implicit condition, in every grant of probation, that the probationer obey all laws (*People v. Arreola* (1994) 7 Cal.4th 1144, 1149 [31 Cal.Rptr.2d 631, 875 P.2d 736]; *People v. Lippner* (1933) 219 Cal. 395, 399 [26 P.2d 457]; *People v. Cortez* (1962) 199 Cal.App.2d 839, 844 [19 Cal.Rptr. 50]; cf. *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433, 1446 [7 Cal.Rptr.3d 226] (*Tilehkooh*)). Section 11362.5, enacted by the voters in November 1996 through voter initiative Proposition 215, "gives a person who uses marijuana for medical purposes on a physician's recommendation a defense to certain state criminal charges involving the drug, including possession [citations]." (*Ross*, at p. 923.)

The MMP, designed to clarify the CUA and facilitate its enforcement, provides enhanced protection through use of identification cards. "At the heart of the MMP is a voluntary 'identification card' scheme that, unlike the CUA—which . . . provides only an *affirmative defense* to a charge of possession or cultivation—*provides protection against arrest* for those and related crimes. Under the MMP, a person who suffers from a 'serious medical condition,' and the designated 'primary caregiver' of that person, may register and receive an annually renewable identification card that, in turn, can be shown to a law enforcement officer who otherwise might arrest the program participant or his or her primary caregiver." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1014 [103 Cal.Rptr.3d 733, 222 P.3d 186], fns. omitted (*Kelly*).)

Not surprisingly, it seems that the enhanced protection from arrest has proven irresistible to those illegally trafficking marijuana, for if there is even rough accuracy in the anecdotal estimate by the arresting detective in this case—that *nearly 90 percent* of those arrested for marijuana sales possess either a CUA recommendation or a card—then there is obviously widespread abuse of the CUA and the MMP identification card scheme by illicit sellers of marijuana.[2] Ninety percent far exceeds the proportion of legitimate medical

---

[2] The New York Times recently reported that "on the boardwalk of Venice Beach, pitchmen dressed all in marijuana green approach passers-by with offers of a $35, 10-minute evaluation for a medical marijuana recommendation for everything from cancer to appetite loss." (Onishi, *Marijuana Only for the Sick? A Farce, Some Angelenos Say,* N.Y. Times (Oct. 7, 2012) pp. 1, 16.) The ready availability of marijuana cards is easily confirmed by a random perusal of cannabis Web sites advertising medical recommendations and identification cards as obtainable in an hour or less, for a modest price, with online appointments taken and walk-ins often welcome, and with online verification services provided. (E.g., Compassionate Health Options, FAQ's <http://www.green215.com/faqs> [as of Oct. 29, 2012]; Affordable Evaluations for

marijuana users one would expect to find in the populace at large. For this and other reasons, it is impossible for us not to recognize that many citizens, judges undoubtedly among them, believe the CUA has become a charade enabling the use of marijuana much more commonly for recreational than for genuine medical uses. This widespread perception tests the judicial process. On the one hand, judges cannot, without danger to the integrity of their own enterprise, permit this attitude to undermine judicial fidelity to the right the CUA creates, which after all expresses the will of the people. But neither, on the other hand, does it mean courts may condone, even tacitly, conduct not clearly protected by the CUA.

In this case, despite ample reason to question Leal's claim of valid CUA use of marijuana, and for reasons, if any, that are undisclosed, the prosecutor made no discernible effort to challenge the validity of the card Leal produced. (See *Moret, supra,* 180 Cal.App.4th at p. 871 [card deemed prima facie evidence of CUA protection] (dis. opn. of Kline, P. J.).) A card that reveals false information, fraud, or other violations of the CUA may certainly be challenged. (Cf. § 11362.71, subd. (e) [holder may be arrested upon "reasonable cause to believe that 'the information contained in the card is false or falsified, the card has been obtained by means of fraud, or the person is otherwise in violation of the provisions of this article"]; *Kelly, supra,* 47 Cal.4th at pp. 1014–1015.) But if a prosecutor determines from the card, and its identifying photo and user identification number, that the card is issued to the bearer, is not expired, and is valid according to county health department records (§ 11362.735, subd. (a)(1)–(5)), further inquiry can be limited at the step-one stage. Case law prevents a court from second-guessing the wisdom of voters in defining allowed uses of marijuana under CUA criteria (*People v. Hughes* (2012) 202 Cal.App.4th 1473, 1481 [136 Cal.Rptr.3d 538] (*Hughes*); cf. *People v. Beaty* (2010) 181 Cal.App.4th 644, 655 [105 Cal.Rptr.3d 76]), which are broad enough to include arthritis or chronic pain (§ 11362.5, subd. (b)(1)(A)) and, under the "somewhat broader" provisions of the MMP (*People v. Wright* (2006) 40 Cal.4th 81, 94, fn. 8 [51 Cal.Rptr.3d 80, 146 P.3d 531] (*Wright*)), persistent muscle spasms and severe nausea (§ 11362.7, subd. (h)(9) & (11)). As stated in a case finding error in a jury instruction requiring a defendant to be found " 'seriously ill' " (*People v. Spark* (2004) 121 Cal.App.4th 259, 266 [16 Cal.Rptr.3d 840] (*Spark*)): "[A]lthough the prefatory language of subdivision (b)(1)(A) of section 11362.5 contains a reference to 'seriously ill Californians,' that subdivision also contains a list of specified illnesses or conditions for which the medical use of marijuana might

Medical Marijuana <http://www.affordableevaluations.com [as of Oct. 29, 2012]; 1000 Years <http://www.1000yearsclinic.com> [as of Oct. 29, 2012]; Be Legally Green: Medical Cannabis Recommendations for Qualifying Patients <http://www.belegallygreen.com> [as of Oct. 29, 2012].)

be 'deemed appropriate' and 'recommended by a physician who has determined that the person's health would benefit from the use of marijuana in . . . treatment.' (*Ibid.*) The list ends with a catchall phrase 'or any other illness for which marijuana provides relief.' (*Ibid.*) [¶] . . . [T]he voters of California did not intend to limit the compassionate use defense to those patients deemed by a jury to be 'seriously ill.' . . . [T]he question of whether the medical use of marijuana is appropriate for a patient's illness is a determination to be made by a physician [and] not to be second-guessed by jurors who might not deem the patient's condition to be sufficiently 'serious.' " (*Id.* at p. 268.)

As noted, the district attorney in this case did not attack the validity of Leal's identification card or underlying physician authorization. As much as the record suggests Leal used the card merely as a front for recreational uses or illicit sales obviously not permitted by the CUA or MMP, we can only speculate that a cross-check with available 24-hour sources (§ 11362.735, subd. (a)(4)) verified facial validity. We therefore presume that validity and proceed, as did the prosecutor and the court, to the step-two question of whether a nexus to his crimes or future criminality existed, under the *Lent* test, to allow judicial interference with Leal's lawful use of medical marijuana.

## II.  *Step Two—the* Lent *test*

Under the *Lent* test and settled review principles: "We review conditions of probation for abuse of discretion. [Citations.] Generally, '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." [Citation.]' [Citation.] This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term. [Citations.] As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality. [Citation.]" (*People v. Olguin* (2008) 45 Cal.4th 375, 379–380 [87 Cal.Rptr.3d 199, 198 P.3d 1] (*Olguin*); see *People v. Carbajal* (1995) 10 Cal.4th 1114, 1126–1127 [43 Cal.Rptr.2d 681, 899 P.2d 67] (*Carbajal*).)

Taking first the inquiry into whether prohibited conduct is "itself criminal," it is settled that medical use of marijuana as authorized by the CUA, while

still criminal under federal law (see *Ross, supra*, 42 Cal.4th at pp. 923–924), is not conduct that is itself criminal for purposes of the *Lent* test.[3]

■ The issues are therefore whether the circumstances in Leal's case showed a sufficient nexus to his offenses or to future criminality. Leal argues that neither is shown, but we disagree. The disjunctive nature of the three-part *Lent* test means that Leal's CUA use may be prohibited if a sufficient relationship appears under one or both of the other elements (*Olguin, supra*, 45 Cal.4th at pp. 379–380), and both are amply supported here.

The decision in *Hughes, supra*, 202 Cal.App.4th 1473, is highly analogous. Hughes was found guilty of marijuana offenses stemming from a traffic stop by officers who found him transporting marijuana plants in a truck. He had a physician's statement for medical marijuana and told the officers that he was taking the plants to a marijuana cooperative to trade them for finished marijuana that he would use for his medical needs, but paperwork and other circumstances showed that he possessed the plants for sale. (*Id.* at pp. 1475–1476.) Finding no abuse of discretion in prohibiting his possession of all marijuana, "even for medical use," *Hughes* reasoned: "The probation term . . . has a relationship to the crimes of which defendant was convicted, namely cultivating marijuana, possessing marijuana for sale, and transporting marijuana. In addition, the probation term forbids conduct that is reasonably related to future criminality in that defendant purported to rely on the CUA to justify his possession of the marijuana plants he was transporting to sell in Los Angeles. Consequently, [the court] could prohibit such possession as a condition of defendant's probation. [Citation.]" (*Id.* at p. 1481.)

■ Similarly here, Leal was convicted of possessing marijuana for sale, possessed cannabis cards, and tried to hide behind his medical authorization

---

[3] An early decision upheld a CUA use probation ban based in part on it being federally proscribed (*People v. Bianco* (2001) 93 Cal.App.4th 748, 752–753 [113 Cal.Rptr.2d 392] (*Bianco*); *id.* at pp. 755–756 (conc. & dis. opn. of Scotland, J.) [resting solely on that ground]), but that division changed course after high court clarification that the CUA conferred limited immunity (*People v. Mower* (2002) 28 Cal.4th 457, 470, 482 [122 Cal.Rptr.2d 326, 49 P.3d 1067]). The reasoning now is: "Although *both* the California and federal law proscribe marijuana possession, the California law precludes the imposition of a sanction in the circumstances addressed by section 11362.5. [¶] California courts do not enforce the federal marijuana possession laws when defendants prosecuted for marijuana possession have a qualified immunity under section 11362.5. Similarly, California courts should not enforce federal marijuana law for probationers who qualify for the immunity provided by section 11362.5. [¶] [*Bianco*] did not consider the fact that what was being enforced was state and not federal law." (*Tilehkooh, supra*, 113 Cal.App.4th at pp. 1446–1447; see *People v. Brooks, supra*, 182 Cal.App.4th at p. 1351.) We accept, as other courts have (see, e.g., *Hughes, supra*, 202 Cal.App.4th at p. 1481), that CUA use remaining a federal law violation is not a valid basis, under the *Lent* test, for imposing probation conditions prohibiting CUA use. (Cf. *Wright, supra*, 40 Cal.4th at pp. 89–90, fn. 5.)

to screen his illegal sales activities. His effort in the first case was ambiguous in that he evidently remained silent, not expressly claiming to possess all of the bags for his personal medical use, but his attempted deception was clear in the second case, which in turn cast light on the first. In a shifting series of explanations, he told the arresting officers that one bag was for his personal use, that he had the marijuana for his mother's cancer, and then, in an evident effort to account for the 72.6 grams, that he smoked an "eighth" every hour and a half. It was a simple-minded effort, to be sure, accompanied by admissions that some of the drug was for "business" and that he "loves to smoke 'weed,' " but it was attempted deception just the same. Testimony by Detective Vincelet that nearly 90 percent of his drug-sales arrests involved sellers with cannabis cards further reinforced what was obviously going on with Leal. The connection to future criminality was, as in *Hughes*, that he was using the CUA as a front for illegal sales, even if some of what he possessed might have been for his own medical use. If allowed to continue medical use, he would have an incentive to keep masking illegal activity with his CUA status, and increase the danger of his conduct by carrying firearms. The trial court aptly made all of those observations in imposing the probation condition.

Leal argues that there is no relationship to his crimes because there was no evidence that he had sold any marijuana he obtained from a dispensary for his own use, but his argument fails. The point is not where the marijuana came from, but that he was misusing medical authorization in hopes of escaping arrest and prosecution. It also defies logic to think that he would buy marijuana at a dispensary while in the business of selling the drug illegally— unless, of course, he was simply keeping up a façade of CUA status to mask his criminality.[4]

---

[4] Leal suggests, albeit without a separate heading to properly flag the issue (Cal. Rules of Court, rule 8.204(a)(1)(B)), that prohibiting his CUA use affects a fundamental constitutional right, for he quotes this observation in *Bianco, supra*, 93 Cal.App.4th at pages 754–755: "[T]rial courts may impose conditions of probation that impinge on a defendant's constitutional rights if they are 'narrowly drawn' and ' "reasonably related to a compelling state interest in reformation and rehabilitation." ' [Citations.]" His briefing elaborates: "A stringent limitation on the amount of medical marijuana appellant might possess within a particular time frame (e.g., 1 to 2 grams per day) while on probation, perhaps augmented by a requirement that he only acquire such marijuana from a licensed dispensary, would virtually eliminate any possibility for appellant to profit from marijuana activity and thus discourage appellant's future criminality as effectively as a complete prohibition. The trivial cash value of a very small amount of permitted medical marijuana also would eliminate any incentive for him to carry a weapon to protect his medicine from theft. Well-crafted probationary restrictions on appellant's use and possession of medical cannabis would reduce the likelihood of future criminal conduct without depriving him of a source of medical help that might well be essential to his rehabilitation."

Leal does not reveal what fundamental constitutional right he thinks is involved here, but *Bianco* made its observation as to an asserted right to privacy, noting: "There is no

### III. *Step Three—Balancing the Needs*

■ Finding discretion under the *Lent* test to interfere with a probationer's CUA use of marijuana, however, does not mean that the court *must* impose an interfering condition, for *discretionary* action is, by definition, something permitted, not required. This is implicit in the *Lent* test: "*Generally*, '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." [Citation.]' [Citation.]" (*Olguin, supra*, 45 Cal.4th at p. 379, italics added.) Stated more broadly: " 'The court *may* impose and require . . . [such] reasonable conditions[] as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer.' (Pen. Code, § 1203.1, subd. (j).) The trial court's discretion, although broad, nevertheless is not without limits: a condition of probation must serve a purpose specified in the statute. In addition, we have interpreted Penal Code section 1203.1 to require that probation conditions which regulate conduct 'not itself criminal' be 'reasonably related to the crime of which the defendant was convicted or to future criminality.' (*People v. Lent, supra*, 15 Cal.3d 481, 486.) As with any exercise of discretion, the sentencing court violates this standard when its determination is arbitrary or capricious or ' " 'exceeds the bounds of reason, all of the circumstances being considered.' " [Citations.]' [Citation.]" (*Carbajal, supra*, 10 Cal.4th at p. 1121, italics added.)

---

fundamental state or federal constitutional right to use drugs of unproven efficacy, and the traditional rational basis test is appropriate in evaluating restrictions on such drug use. [Citation.] While the majority of California voters undoubtedly believe that marijuana has legitimate medical uses, there remains a vigorous debate on this point." (*Bianco, supra*, 93 Cal.App.4th at p. 754.) Then, assuming that such a right might be involved, *Bianco* found a medical use prohibition valid on the facts of the case, as "closely related to the offense of which defendant was convicted [(cultivating marijuana; § 11358)] and it serves the interests of reformation and rehabilitation by precluding future criminal conduct." (*Id.* at pp. 754–755.)

Leal identifies no other fundamental constitutional right, and his seeming reliance on privacy is no stronger than that of the defendant in *Bianco*, who had a "physician's recommendation . . . facially in compliance with" the CUA that was issued to help alleviate pain he suffered due to unidentified "serious medical problems." (*Bianco, supra*, 93 Cal.App.4th at p. 750.) The suggestion by Leal's appellate counsel that medical marijuana is "help that might well be essential to [Leal's] rehabilitation" is vastly overstated. Our record gives no clue how much relief Leal got for his "diagnosis of hypertension and post-traumatic stress" (trial counsel's statement) or what dosage was authorized. Nothing allows us to infer that prohibiting medical use of marijuana would cause serious medical impairment for Leal or that he could not obtain relief from other drugs. Hence, on this record, we see no infringement of a fundamental constitutional right greater than what *Bianco* rejected.

The step-three exercise of discretion is vital in limiting medical use of marijuana, for it entails a unique balance of competing public policies. On one hand, the step-one conclusion that a defendant has CUA authorization implicates a voter-compelled policy that qualified patients be allowed to alleviate medical problems through the use of marijuana. On the other hand, the step-two conclusion that the relationship of that lawful use to the crimes the defendant committed, or his or her future criminality, raises a competing policy consideration: the need to rehabilitate the defendant and protect the public during his or her release on probation. The resolution of these competing policies necessarily requires weighing the needs of one against the other before deciding whether and how much to limit the lawful conduct.

That balance will vary widely from case to case. In an extreme case of need for medical marijuana, for example, the drug might be an effective and least harmful way to alleviate debilitating suffering from end-stage pancreatic cancer. (Reichbach, *A Judge's Plea for Pot*, N.Y. Times (May 16, 2012) <http://www.nytimes.com/2012/05/17/opinion/a-judges-plea-for-medical-marijuana.html> [as of Oct. 29, 2012].) Such a person would not likely be selling marijuana, but it is certainly possible. It is also hard to imagine that a probation order banning a person so afflicted from using medical marijuana pursuant to the CUA would not constitute an abuse of discretion despite a *Lent*-based nexus to the selling offense, for example, where there was little or no further threat to society. Far more commonly, of course, the rehabilitative/protective need could outweigh a lesser medical need, or one that could be efficaciously met by alternative means.

We stress that this third step balancing of competing needs does not allow a court to question the wisdom of voters or the validity of an unchallenged card or the underlying medical authorization. The requisite balancing contemplates a judicial assessment of medical need and efficacy based upon evidence: the defendant's medical history, the gravity of his or her ailment, the testimony of experts or otherwise qualified witnesses, conventional credibility assessments, the drawing of inferences, and perhaps even medical opinion at odds with that of the defendant's authorizing physician.

In the case before us, there was abundant step-three evidence of a need to rehabilitate Leal and protect the public. Leal used CUA authorization as a front for illegal sales of marijuana, sales partly carried out with a loaded semiautomatic handgun in a public park occupied by mothers and their young children (pt. II, *ante*).

Against that showing, there was no evidence of an overriding medical need. The asserted need was, in fact, nothing more than defense counsel's unsworn statement at the sentencing hearing: "[M]y client does have a

diagnosis of hypertension and post-traumatic stress and that is what he uses marijuana to treat." If more was revealed during the off-the-record discussion that preceded that remark, it is not preserved for the record. Nor does the record shed light on the severity of Leal's asserted ailments, the efficacy of treating them with medical marijuana, or the feasibility and efficacy of any alternative treatments that may be available. Actually, his statements to the detective at the hydroponics supply store—first that he was "smoking as much [marijuana] as he can" while out on bail for a robbery, then that he had a marijuana card for his *mother's* cancer, and lastly that "he loves to smoke 'weed'"—create substantial doubt that Leal's use of marijuana was genuinely "medical."

Thus, the record provides ample evidence of rehabilitative need and, on the medical need side, nothing beyond mere possession of a medical use identification card. That card meant only that Leal met a minimal threshold, in a recommending physician's view, of getting some unquantified "benefit from the use of marijuana" (§ 11362.5, subd. (b)(1)(A)) to help alleviate conditions within the broad sweep of the CUA and MMP (§§ 11362.5, subd. (b)(1)(A), 11362.7, subds. (g)–(h)), which did not require Leal to suffer a serious illness (*Spark, supra,* 121 Cal.App.4th at p. 268). Leal was apparently the only party able to produce evidence of the medical benefits marijuana provided him and any alternative remedies he might have tried, yet he offered no such evidence. He therefore cannot show that the court's implicit step-three finding that the balancing of needs favored prohibiting CUA use constituted an abuse of discretion.[5] Nor can he show that the trial court's failure to narrowly tailor the probation condition to something short of a complete ban constituted an abuse of discretion, because he did not ask the court to pursue that course.[6]

---

[5] We do not suggest that the record must reveal that the three steps of inquiry identified in this opinion are numbered identically, or were considered and resolved in lockstep progression. Further, a balancing-of-needs finding against a defendant is, as in this case, necessarily implied in a probation condition limiting or disallowing CUA use of marijuana.

[6] Appellate counsel belatedly advocates that courts be required to consider: "a. Quantitative information concerning defendant's medical marijuana needs, including: [¶] 1) Whether defendant's recommending physician, or some other qualified physician experienced in the dosing of cannabis for medical purposes, can quantify the dosages and total amount of marijuana that defendant would require throughout the probationary period. [¶] 2) Whether the quantitative determination of defendant's medical marijuana needs is based on any objective factors, such as those identified in published medical research or in the professional experience of the recommending physician. [¶] 3) The amount of medical marijuana that the defendant views as . . . reasonable to meet his or her anticipated medical needs during the probationary period, and whether that amount coincides with his or her physician's recommendation. [¶] 4) Whether defendant has an understanding of how he or she might legally obtain whatever quantity of medical marijuana the court might be prepared to authorize. [¶] 5) Whether the amount of medical marijuana that the court might contemplate authorizing is adequate to allow probationer to benefit from volume discounts rather than compelling its purchase at the high prices usually associated with gram purchases at a dispensary. [¶] b. Defendant's willingness to

## IV. *Other Issues*

### A. *Authority to limit CUA use*

We address next the parties' supplemental briefing on whether a sentencing court may utilize section 11362.795, on its own motion, or otherwise inquire into a defendant's right and need to use medical marijuana under the CUA. We inquired about this, in part, because the statute speaks not of a court, but a "probationer," or "defendant" on bail, requesting confirmation of CUA use: "(a)(1) Any criminal defendant who is eligible to use marijuana pursuant to Section 11362.5 [(the CUA)] may request that the court confirm that he or she is allowed to use medical marijuana while he or she is on probation or released on bail. [¶] (2) The court's decision and the reasons for the decision shall be stated on the record and an entry stating those reasons shall be made in the minutes of the court. [¶] (3) During the period of probation or release on bail, if a physician recommends that the probationer or defendant use medical marijuana, the probationer or defendant may request a modification of the conditions of probation or bail to authorize the use of medical marijuana. [¶] (4) The court's consideration of the modification request authorized by this subdivision shall comply with the requirements of this section." (§ 11362.795, subd. (a)(1)–(4).) Parallel language authorizes a *parolee* to request confirmation. (*Id.*, subd. (b)(1)–(4).)

Two members of our panel in *Moret* addressed this question in 2009, without agreement. Justice Haerle reasoned that the MMP section, by authorizing confirmation of a CUA use request and requiring a statement of reasons for the decision, necessarily implied court authority to deny confirmation and, further, to forbid CUA use altogether as a condition of probation. (*Moret, supra*, 180 Cal.App.4th at pp. 853–854 (lead opn. of Haerle, J.).) This author differed, reasoning that authority to *confirm* (or *not* confirm) did not necessarily encompass authority to forbid CUA-authorized use (in effect, to confirm CUA authorization while forbidding the authorized use) (*Moret*, at pp. 885–887 (dis. opn. of Kline, P. J.)), and that the MMP, if it did confer such authority where the voters had not provided for it in the CUA or

accept periodic medical review of his medical marijuana needs during the probationary period, and to stop using medical marijuana if his physician concludes it no longer benefits the underlying medical condition. [¶] c. Defendant's willingness to agree not to engage in any collective or cooperative medical marijuana cultivation, harvesting or packaging activities beyond those necessary to acquire an amount of medical marijuana authorized by the court. [¶] d. Defendant's willingness to attend an appropriate number of drug counseling classes if the probation officer finds objective evidence of economic or family dysfunction that appears to accompany defendant's medical marijuana use."

Some of. these suggestions appear to depend on the feasibility of a probation officer monitoring and enforcing use of *particular quantities* of marijuana, and our record sheds no light on that issue.

authorized the Legislature to do so, would amount to an invalid restriction of a voter initiative by the Legislature, in violation of the state Constitution (*Moret*, at pp. 887–888; Cal. Const., art. II, § 10, subd. (c)). After *Moret*, our Supreme Court did invalidate, on the constitutional ground, the MMP's imposition of quantity restrictions of marijuana, where the CUA itself imposed none. (*Kelly, supra*, 47 Cal.4th at pp. 1012–1017, 1024–1025, 1042–1043, 1048–1049 [holding invalid, but severable, that part of § 11362.77].) More recently, Court of Appeal decisions in *Brooks* and *Hughes* have embraced Justice Haerle's *Moret* position, discerning no *Kelly*-like conflict. (*Hughes, supra*, 202 Cal.App.4th at pp. 1480–1482; *People v. Brooks, supra*, 182 Cal.App.4th at p. 1352.)

Leal takes the position that section 11362.795 "does <u>not</u> appear to vest the trial court with authority to reject [a confirmation] request simply because the court and/or the prosecution harbors doubts about the quality of the underlying medical examination, believes that other drugs might be equally or more beneficial to the defendant, or suspects that defendant's life or health is being impaired by marijuana use." But then, and perhaps alternatively, he seems to accept the views Justice Haerle expressed in *Moret*, adopted in *Hughes*, but stresses cautionary language in *Hughes* that courts should not second-guess the palliative efficacy of CUA use of marijuana or the existence of alternative medications (*Hughes, supra*, 202 Cal.App.4th at p. 1481). The Attorney General concludes, by contrast, that a court "has inherent authority" to invoke section 11362.795 on its own motion, and to inquire into the validity of a defendant's right and need to use medical marijuana.

■ We do not explore section 11362.795 further, for we agree with the Attorney General that a trial court has *inherent* authority and discretion to consider limiting or banning the probationer's use of medical marijuana. Long before *Lent*, trial courts had the authority and discretion to limit or prohibit *lawful* conduct where it served the ends of rehabilitation under what we now call the *Lent* test (*In re Bushman* (1970) 1 Cal.3d 767, 776–777 [83 Cal.Rptr. 375, 463 P.2d 727]), and there is little reason to think the voters who enacted the CUA intended to eliminate that authority. There is prefatory language of intent "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction" (§ 11362.5, subd. (b)(1)(B)), but it does not appear that voters had in mind such an attenuated view of a criminal "sanction" that they meant to abrogate a court's long-standing authority under the *Lent* test to prohibit lawful behavior, as now represented by CUA-approved use of marijuana; the CUA itself *does not even mention probationers.*

■ The most that might be said is that the CUA repeals such authority *by implication*, but " '[i]n interpreting a voter initiative . . . , we apply the same

principles that govern statutory construction. [Citation.]' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900–901 [135 Cal.Rptr.2d 30, 69 P.3d 951].) Our task " 'is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent.' [Citation.]" (*Id.* at p. 901.) "[W]e bear in mind that repeals by implication are disfavored, being recognized only if two apparently conflicting laws cannot be harmonized. [Citations.]" (*In re Manuel L.* (1994) 7 Cal.4th 229, 235–236 [27 Cal.Rptr.2d 2, 865 P.2d 718]; see *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 379 [20 Cal.Rptr.2d 330, 853 P.2d 496].) Since the CUA speaks of insulating qualifying patients and authorizing physicians from criminal "sanction," but without any mention of such persons being probationers ordinarily subject to revocation for violating restrictions of lawful activity under the *Lent* test, the two sources are easily harmonized. CUA use must bow to *Lent* restrictions for a patient who is a probationer. Moreover, the CUA is "a narrow measure with narrow ends," offered to the public as " ' "a delicate tightrope walk designed to induce voter approval" ' "; thus "[w]e must interpret the text with those constraints in mind." (*People v. Mentch* (2008) 45 Cal.4th 274, 286, fn. 7 [85 Cal.Rptr.3d 480, 195 P.3d 1061].) Construing the CUA as abrogating the *Lent* test would not be a constrained reading.

■ Unlike the CUA, the MMP, which was enacted by the Legislature, expressly contemplates medical marijuana use by a probationer. However, while the MMP provides that a probationer (or bailee) may ask to have his or her CUA status judicially confirmed (§ 11362.795), the MMP does not in any way diminish the court's authority and discretion to limit or proscribe lawful conduct under the *Lent* test. The *Lent* test is a settled judicial measure of which the Legislature is presumed to be aware when it acts; it is therefore expected to specify any intent to limit its application. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155–1156 [278 Cal.Rptr. 614, 805 P.2d 873]; cf. *Cannon v. University of Chicago* (1979) 441 U.S. 696, 697–698 [60 L.E.2d 560, 99 S.Ct. 1946].) As the MMP contains no such specification, we have no basis upon which to suspend application of the *Lent* test in the medical marijuana use context. (Cf. *California State Auto. Assn. v. Franchise Tax Bd.* (1987) 191 Cal.App.3d 1253, 1261 [237 Cal.Rptr. 44].)

The court in *Tilehkooh* reached a contrary conclusion, holding in a probation revocation appeal that the CUA prohibited revoking probation based on a misdemeanor conviction for possession of marijuana (former § 11357, subd. (b)), a conclusion based in part on the voter intent to insulate a patient from criminal sanction. (*Tilehkooh, supra,* 113 Cal.App.4th at pp. 1441–1445.) No probation condition in that case had specifically limited the medical use of marijuana; the case involved violation of the general condition that a probationer obey all laws and one that he not use or posses any dangerous drugs or narcotics. (*Id.* at pp. 1435–1440.) Nevertheless, the holding is in tension with our view that the voters did not intend, by the

CUA, to limit a trial court's long-standing authority and discretion to limit or prohibit a probationer's lawful conduct, even concerning medical use of marijuana. For reasons expressed above, we respectfully disagree that the CUA evinces such an intent.

## B. *The No-rehabilitative-purpose Language of* Tilehkooh

We acknowledge broad language in *Tilehkooh* seemingly contrary to our conclusion here about rehabilitative purpose, but we view it as dictum. "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) "[T]he language . . . must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts. [Citation.]" (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097 [95 Cal.Rptr.2d 198, 997 P.2d 511]; see *Trope v. Katz* (1995) 11 Cal.4th 274, 284 [45 Cal.Rptr.2d 241, 902 P.2d 259].) "The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning. [Citations.]" (*McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 226 [221 Cal.Rptr. 421].)

There was no probation condition in *Tilehkooh* specifically forbidding the defendant's use of medical marijuana, nor had there been a *Lent*-based finding to support one. There was also no record of the defendant's conduct in the offense underlying the probation—maintaining a place for the use of controlled substances. (*Tilehkooh, supra,* 113 Cal.App.4th at pp. 1438–1445; § 11366.) The opinion nevertheless explored the possibility of a *Lent*-based ban and, under a heading declaring "THE REVOCATION OF PROBATION FOR THE MEDICAL USE OF MARIJUANA SERVES NO REHABILITATIVE PURPOSE," wrote: "A probation condition, even if it is not a violation of the criminal law, must be 'reasonably related to the crime of which the defendant was convicted or to future criminality.' [Citation.] However, it ordinarily cannot be said that the treatment of an illness by lawful means is so related." (*Tilehkooh,* at p. 1444, quoting *Lent, supra,* 15 Cal.3d at p. 486.) This was dictum, given the lack of a *Lent*-based finding, or any facts on which to decide the appropriateness of one, and the court did say, notwithstanding its broader heading, that there was "ordinarily" no rehabilitative purpose. (*Ibid.*) *Tilehkooh* also did not appear to consider, within the term "rehabilitative purpose," the need to protect the public during a probationer's conditional freedom.

The evidence in this case shows both rehabilitative and public-protection value in interfering with Leal's medical use of marijuana while on probation.

Further, the trial court's finding that Leal was apt to carry a gun to protect even the marijuana he used for medical purposes brings the case within the purview of the voters' declared intent that the CUA shall not be construed "to supersede legislation prohibiting persons from engaging in conduct that endangers others . . . ." (§ 11362.5, subd. (b)(2).)

### DISPOSITION

As imposition of the challenged probation condition was not an abuse of discretion, the judgment is affirmed.

Haerle, J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 13, 2013, S207203.