Filed 4/3/13  P. v. Perry CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BLAINE PERRY,<br><br>      Defendant and Appellant. | A134385<br><br>(Napa County<br>Super. Ct. No. CR158209) |

Blaine Perry appeals from an order denying his post-judgment motion under Health and Safety Code section 11362.795[1] to modify his probation conditions to allow his use of medical marijuana under the Compassionate Use Act of 1996 (CUA) (§ 11362.5) and Medical Marijuana Program (MMP) (§ 11362.7 et seq.).  We affirm the order.

---

[1]  All undesignated section references are to the Health and Safety Code.

Section 11362.795 provides in pertinent part:  "(a)(1) Any criminal defendant who is eligible to use marijuana pursuant to Section 11362.5 may request that the court confirm that he or she is allowed to use medical marijuana while he or she is on probation or released on bail.

"(2) The court's decision and the reasons for the decision shall be stated on the record and an entry stating those reasons shall be made in the minutes of the court.

"(3) During the period of probation or release on bail, if a physician recommends that the probationer or defendant use medical marijuana, the probationer or defendant may request a modification of the conditions of probation or bail to authorize the use of medical marijuana.

"(4) The court's consideration of the modification request authorized by this subdivision shall comply with the requirements of this section."

1

BACKGROUND

*Commitment offense.* In an April 10, 2009 negotiated disposition of an amended complaint in Marin County Superior Court, Perry pled guilty to one count of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)) in return for dismissal of counts for corporal injury on a cohabitant and making terrorist threats (Pen. Code, §§ 273.5, subd. (a), 422). All charges involved an attack on a woman identified confidentially as Jane Doe, and a *Harvey* waiver (*People v. Harvey* (1979) 25 Cal.3d 754) allowed consideration of the dismissed counts at sentencing.

Sentencing on May 27, 2009, proceeded with little documentation of the crimes. Perry had waived a preliminary hearing, and both sides waived a presentence report that a referral to probation had not yet produced. Letters from Doe and her mother focused on victim impact, not the crime facts.

Deputy District Attorney A. J. Brady stated: "With regard to the facts of this case, this case settled before preliminary examination, so I don't know how much the Court knows or remembers about it. I would like to just give a summary. The confidential victim in this case Mr. Perry had formerly had a dating relationship, although that dating relationship had terminated prior to the incident date.

"On the incident date [she] was contacted because the defendant showed up to work severely intoxicated. He is a care provider, a job which the confidential victim arranged for him to have. She's also a care provider for people with disabilities. Apparently, he showed up intoxicated. She was contacted because she is his supervisor.

"She picked him up. On the ride home to her residence in San Rafael the defendant began making threatening statements. Specifically through the ride between being picked up and to the confidential victim's apartment, the defendant indicated that he was going to get people to shoot up the place, call his friends. He was calling, it appeared, to the confidential victim, that he was calling people on cellphones saying they could come over and shoot her, shoot up the place.

"When they arrived back at the apartment, she ran [inside], and he began making a scene outside of the apartment, again similarly appeared to be talking on the phone

2

making those same sort of threats.  Eventually, in order to pacify him, she opened up the front door of the apartment in order to pack up his stuff because they had broken up, and she wanted his stuff out of the house.

"Inside the bedroom the defendant began throwing items around, including compact disks.  Some of those . . . struck the confidential victim.  The defendant then pushed the victim on the shoulders onto the bed.  He then straddled her with one leg between her legs, and one leg on the outside and began choking her.  According to . . . an interview I conducted with her, he indicated that at that time he was saying he should kill her or he should rape her.  But actually he needed a ride back home later on so he wasn't going to rape her right then.  And he also indicated that he should call his friends to come up and rape her.  And the victim indicated she was having difficulty breathing as a result of that.

"After the defendant let go, again the victim tried to move him out of their residence and continued to move stuff out of the apartment.  Once they were both outside of the apartment, she locked the door behind her, and again the defendant put his arm around her, this time in sort of a headlock maneuver where her head was in the nook of his arm, and again choked her actually lifting her up off the ground at this point.  She ran away and got in the car and drove off and called the police.

"The victim was quite distraught both at the scene and has been since.  I think that the Court probably has a good feel for that from the victim impact letters, as the impact on her has been tremendous."

Brady then advanced his sentencing preferences, advising the court about prior arrests and other sentencing factors he could, given lack of a written report evaluation, noting that Perry's insistence on proceeding without one might deprive the court of factors *favorable* to the defense.  In proposing conditions of probation, and again lamenting the lack of formal evaluation, Brady proposed:  "But being that I at least know that he showed up on this particular day so intoxicated he needed to be taken away from his place of work, that the defendant not use, possess, or transport alcohol or illegal substances including prescribed marijuana without being authorized by the Court.  And

3

similarly, in order to enforce that, the defendant be required [to] submit to chemical testing at the request of any peace officer or probation officer."

Defense counsel Kimberly Fitzgerald did not dispute any of Brady's factual representations but added some of her own, saying her client was remorseful, accepted responsibility, had had time in custody to reflect on what happened, was young at age 23, would use a 52-week domestic violence course to "help him deal better with relationships in the future," would improve his parenting skills for a small son, did not intend to see or contact Doe again, and planned to live in Sonoma.

On the facts of the charges, Fitzgerald added, referencing police records: "He's— to just take a moment to address some of the facts that the District Attorney discussed in this case, the facts as laid out sound really bad. And I think there is always . . . two sides of a story. And this is not to minimize or condone anything that happened, but just to try to give the Court some perspective.

"There were photographs taken by the police officers in this case. There is no injury. There is no alleged bite mark on her cheek. There's no injury showing that. There's no broken skin. There's no scratch. There is no redness really around the neck. And there's—the District Attorney mentioned that the fact that he had indicate that he was going to kill her or have friends kill her or rape her, what she first told the police after the incident . . . was that he was going to kill her. Then nine days later when she talked to the District Attorney, then it changed to that he was going to rape her, have his friends come and rape her. So, there's—there's some differences in—in her story.[2]

"She's very young. She's 20 years old. She just came out of a three year relationship. There's—there's something that between what was stated to police

---

[2] A record augmentation includes a statement of probable cause dated March 25, 2009, which is evidently the document defense counsel referenced. It recites: "Perry and the victim have been dating for approx. $1^{1}/_{2}$ months and living together for 3 weeks. During an argument, Perry pushed the victim onto a bed and began choking her. Perry slapped the victim in the leg. Perry later bit the victim on the cheek, causing redness to her cheek. Earlier, Perry threatened to shoot the victim. The victim is in fear for her life."

4

officers and—and the District Attorney and what the photographs and evidence show that everything does not really quite seem to—to match up in this case."

Perry's briefing can be construed as taking issue with reliance by the Attorney General on Brady's representations about the charges, at least as to Perry's intoxication, but the reliance is proper. Unsworn statements by counsel do not ordinarily constitute evidence (*County of Alameda v. Moore* (1995) 33 Cal.App.4th 1422, 1426), but these attorney representations, on both sides, were offered in lieu of a presentence report and, while not formally stipulated as such, were meant for the court to rely on as evidence. The court also understood the representations that way, expressly relying on what had been said, and prefacing its ruling by saying: "Well, I am at somewhat of a disadvantage . . . without a probation officer's report, but I think between what you both have said, as well as the letter from the victim and her mother, I think I have a fairly good understanding of—of the underlying facts." Lack of objection by either attorney to the other's representations further justifies reliance on the statements. (Cf. *People v. Medina* (1995) 11 Cal.4th 694, 731.)

The court suspended imposition of sentence and placed Perry on four years' probation, with terms that he: serve nine months in local custody; not contact the victim; participate in any treatment or counseling directed by the probation officer; and not use or possess any "illegal substances, including prescribed marijuana, unless specifically authorized by the court." The court explained in part: "I do believe that given what I understand to be the fact, that as this event unfolded—as it began, I should say, the defendant was under the influence, apparently, of alcohol or some other substance. I think the terms that relate to that are appropriate."

In June 2011, after Perry moved to Napa, the case was transferred to Napa County on motion of the probation department (Pen. Code, § 1203.9).

***Probation violation***. On November 10, 2011, a petition to revoke probation was filed in Napa County Superior Court alleging that Perry "[f]ailed to successfully complete a 52 week domestic violence anger management counseling program" and "[s]ubmitted a positive drug test on August 29, 2011 and November 3, 2011 for THC" (*People v. Rigo*

5

(1999) 69 Cal.App.4th 409, 413 [tetrahydrocannabinol (THC) is the primary intoxicating ingredient in marijuana]).  Probation was denied summarily that same day, and counsel was appointed for him for entry of his denial at a hearing on November 21.  His counsel informed the court at that hearing that Perry said he had "at some point now, signed up for his anger management and has begun that," and Perry had already filed a motion, acting as his own counsel, that he be allowed to use medical marijuana under the CUA while on probation.  The motion did not include any medical authorization, or sworn particulars.  It presented general information printed from the Web on spondylolisthesis, a medical condition described as one or more vertebrae of the spine shifting forward or backward, copies of provisions of the CUA and MMP and the decision in *People v. Tilehkooh* (2003) 113 Cal.App.4th 1433 (*Tilehkooh*), plus written instructions Perry had gotten from Kaiser Permanente on exercises to do for the condition.

At a hearing on December 21, 2011, Perry admitted the probation violation, agreeing to the petition's request that probation be reinstated with a further 90 days of jail stayed pending completion of a 52-week program.  He had begun an anger management program, Healing in Progress, on a referral from probation.  Defense counsel mentioned the violation as being failure to complete such a program, but nothing in the record shows that Perry's admission to the probation violation was limited to that ground.  On the pending pro per request to use medical marijuana, defense counsel represented that Perry had a medical marijuana card in Marin County that satisfied probation there, but that his probation officer in Napa County required that he get court approval.  The court noted lack of a doctor's recommendation with the motion, and the probation department was recommending denial because Perry had not provided medical marijuana documentation and, in fact, had provided documents showing that his primary care provider recommended exercises and prescribed naproxen as need for pain, but not marijuana. The court ordered the request "[d]enied without prejudice" and urged Perry to get proper documentation.  Perry does not challenge that denial on appeal.

*Second medical marijuana request*.  Perry filed a second pro per request on December 21, 2011, and the matter was heard on January 6, 2012.  One of the documents

6

filed with the court was a memorandum from probation that discussed none of Perry's showing but recommended denial because the minute order denying his original request had been denied "without prejudice." No one relied on that absurd bit of circular reasoning. The focus, rather, was on the showing made.

The showing, treated cumulatively to the first, included a "Therapeutic Cannabis Recommendation" of May 26, 2011, by Richard Lenson, MD, of Compassionate Health Options, reciting in part that Perry was examined and found to have "a medical condition that in my professional opinion would benefit from the use of medical cannabis." The entire document is printed, except for the patient, date, signature, and a cryptic diagnosis of "724.2, seasonal allergies." The "724.2" is not explained in the record, but the parties agree that it is medical code for lumbago, i.e., lower back pain. (See Find-A-Code, <http://www.findacode.com/icd-9/724-2-lumbago-icd-9-code.html> [as of Jan. 18, 2013].)

A second new document is a December 21, 2011, letter from Huma Imtiaz Sadiq, MD, of The Permanente Medical Group, Inc., in Vallejo. Naming Perry, it states: "The above named patient is seen for chronic back pain and is diagnosed with mild vertebral body wedging and that might have led to the disc bulge at L5-S1 per MRI. Patient has been using NSAIDs[3] for pain control and also being referred for the physical therapy."

Deputy District Attorney Jodi Dell urged denial, reasoning in essence that: the recommendation was "questionable" since it was not from a doctor who was regularly treating Perry for his condition; his "Kaiser doctor" had not said that marijuana was needed; no other doctors treating Perry, and nothing in his initial 30 pages of material, had urged marijuana use; with Perry required to do drug testing on probation, it would be "problematic for him to be able to use medical marijuana and submit to testing"; and marijuana was still unlawful under federal law.

---

[3] We are hindered once more by lack of record explanation for a term used below, but a cursory search of the Web for "NSAIDs" reveals sites that show it as an acronym for non-steroidal anti-inflammatory drugs—meaning, for our purposes, conventional medicines, not marijuana. The court's later reference to prescribed "anti-inflammatories" as distinct from marijuana, shows that the court shared that understanding.

Perry, acting as his own counsel, presented no declarations or other sworn testimony to bolster his showing, but said he was "no longer eligible for Kaiser," his mother's insurance plan, because he had turned 26 years old, that his own part time work at a store did not provide health benefits, and that medical marijuana was "the only medication that I will be able to seek out." Queried by the court whether marijuana would be more expensive than his regular doctor's recommendation of "anti-inflammatories, like Advil, and Alleve [*sic*], and things like that," Perry offered (still unsworn): "The pills that she was giving me and stuff, because just regular Advil or Tylenol I've take [*sic*] before when I was younger when I first started going to Kaiser for my back problem, and the ones they're giving me, they either made me sick or they gave me intense heartburn. So they kept switching me from medications, and they started putting me on these. But the same thing is happening. It's just not—it's not really taking care of the pain. It's just sub—I mean in the past they haven't worked, and I don't want to take Vicodin. I don't want to get started on something like that. [¶] She—my doctor agrees with me. I've talked to her about my use of medical marijuana. She doesn't promote it. She doesn't deny it. [*Sic*.] She just, you know, if it helps me complete my daily routines, and you know, go to work, and be able to stand, and then come home and be able to take care of my chores at home, then she finds that it's okay for me to do it if I feel that it's fine."

The court ruled: "I'm going to follow the recommendation of probation. I'm going to deny your request. I'm just not satisfied with what you've presented here that there is a sufficient basis for me to allow you to consume medical marijuana during your probationary period. [¶] So the request is denied."

### DISCUSSION

*Leal* announced "a three-step inquiry into limiting CUA use of marijuana by a probationer. First, we examine the validity of any CUA authorization; second, we apply the threshold *Lent* test [(*People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*))] for interfering

8

with such authorization;[4] and third, we consider competing policies governing the exercise of discretion to restrict CUA use." (*People v. Leal* (2012) 210 Cal.App.4th 829, 837 (*Leal*).)  Initially, we address uncertainty about some of Perry's appellate arguments in the wake of *Leal*.

## I. *Issues Resolved by* Leal

Perry's initial briefing raised several arguments that our opinion in *Leal* resolves against him.  We granted Perry leave to file a letter brief on the impact of *Leal*, and have received as well a response from the Attorney General, and a very recent reply by Perry, but Perry's supplemental briefing leaves unclear whether he accepts *Leal*'s holdings on his initially briefed issues.  He neither repeats nor adds to them, but does not concede or withdraw them, either.  So out of caution, we briefly adhere to the pertinent holdings in *Leal*.

Much of Perry's briefing centers on section 11362.795, a provision in the MMP that allows probationers like himself to seek court confirmation of CUA authorization. He argues that the section, when properly read, does not authorize a court to go beyond a facially valid CUA authorization to deny confirmation based on *Lent*; alternatively, he argues if the provision can be read that way, it constitutes an unconstitutional restriction by the Legislature of a voter initiative, the CUA.  We rejected those arguments in *Leal*, holding in essence that a trial court's long-established power to ban otherwise lawful activity under the *Lent* test is inherent, not dependent on authority conferred by the CUA

---

[4] "Under the *Lent* test and settled review principles:  'We review conditions of probation for abuse of discretion.  [Citations.]  Generally, "[a] condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .'  [Citation.]" [Citation.]  This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term.  [Citations.]  As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality.  [Citation.]' [Citations.]" (*Leal*, *supra*, 210 Cal.App.4th at p. 840.)

or the MMP, and that neither enactment explicitly or implicitly terminates that power. (*Leal*, *supra*, 210 Cal.App.4th at pp. 846-849.)

Perry also argues that survival of the *Lent* test in this context renders section 11362.795 (or modification under Pen. Code, § 1203.3) "illusory" and impermissibly allows a trial court to second-guess voter intent and the opinion of an authorizing physician. Not so. We held in *Leal* that the third-step inquiry means that a court finding both CUA authorization and satisfaction of the *Lent* test cannot automatically deny confirmation; it must go on to balance the competing public policy interests. (*Leal*, *supra*, 210 Cal.App.4th at pp. 843-844.) This exercise of discretion also does not constitute a prohibited second-guessing of voters or physicians (*id*. at p. 844), a prohibition more properly invoked during the step-one inquiry into valid authorization (*id*. at p. 839). Perry argued in his initial briefing that the *Lent* test, usually applied at an initial grant of probation, should not apply to post-judgment motions to modify, but we cannot share his view given that the same competing interests arise in both situations.

Perry invokes language in *Tilehkooh*, *supra*, 113 Cal.App.4th at page 1444, broadly suggesting that prohibiting CUA-authorized use of marijuana serves no rehabilitative purpose. We examined that language in *Leal*, found it to be dictum, and disagreed, further, with the notion that prohibiting CUA use cannot serve a rehabilitative purpose. (*Leal*, *supra*, 210 Cal.App.4th at pp. 849-850.)

The Attorney General's initial briefing seconded the reasoning of the prosecutor below that continuing illegality of marijuana possession under *federal* law is enough to justify CUA use as conduct that is in itself criminal, and her letter brief does not mention or concede that *Leal* expressly rejected that notion. (*Leal*, *supra*, 210 Cal.App.4th at pp. 840-841 & fn. 3.) We adhere to *Leal* on that point as well.

## II. *Step One Issues*

Beyond the federal-illegality argument just noted, Perry faults prosecutor Dell's reasoning that Dr. Lenson's marijuana recommendation was "questionable" since it was not from a doctor who regularly treated Perry and since no "Kaiser doctor" or other regular provider had said anything about marijuana being needed. *Leal* embraces the

notion that, "at the step-one stage" of inquiry into the validity of a CUA authorization to use medical marijuana, courts should not second-guess facially valid recommendations or the wisdom of the voters in allowing marijuana use for conditions short of serious illnesses. (*Leal*, *supra*, 210 Cal.App.4th at pp. 839-840 [discussing cards issued under the MMP].) On the other hand, *Leal* holds that, at the step-three stage of balancing competing public policies of medical needs against rehabilitative needs, courts may—and must—take into account "medical need and efficacy based upon evidence: the defendant's medical history, the gravity of his of her ailment, the testimony of experts or otherwise qualified witnesses, conventional credibility assessments, the drawing of inferences, and perhaps even medical opinion at odds with that of the defendant's authorizing physician." (*Id*. at p. 844.)

Here, the prosecutor's argument that Perry's physician recommendation was "questionable" due to lack of corroboration by other medical providers would have been in error if applied to the step-one, rather than step-three, stage of inquiry, but we do not see that the court ultimately did any step-one second-guessing. The court did not confine its ruling to the authorization's validity, but heard all of the evidence and arguments and ruled, apparently more broadly, that Perry produced an insufficient "basis" for allowing him to use medical marijuana.[5] As *Leal* cautioned: "We do not suggest that the record must reveal that the three steps of inquiry . . . were considered and resolved in lockstep progression. Further, a balancing-of-needs finding against a defendant is . . . necessarily implied in a probation condition limiting or disallowing CUA use of marijuana." (*Leal*, *supra*, 210 Cal.App.4th at p. 845, fn. 5.)

We therefore proceed, as the Attorney General's supplemental briefing does, on the conclusion that the court found a facially valid authorization.

---

[5] Because it does not appear that the court rested its decision on any problem in the validity of the authorization, we need not dwell on Dell's concern that Dr. Lenson was not a regular medical care provider for Perry.

11

### III. *Step Two Issues*

Perry argues that there was an insufficient nexus, under *Lent*, between restricting his use of medical marijuana, and either his commitment offense or preventing future criminality. There was no argument or express ruling on this point, but the court, by finding an insufficient "basis" to allow medical marijuana use, implicitly found that *Lent* was satisfied. The record supports the ruling.

Perry's claim of insufficient nexus rests in part on the idea that his admission to violating probation did not included the ground that he twice tested positive for THC. The premise is faulty. As already noted in the background part of this opinion, while there was mention at the admission hearing of Perry's failure to take the 52-week anger management course and no correlative mention of the positive THC tests, nothing in the ensuing admission of probation violation, or the advisements or other colloquy leading to it, limited the admission to the former ground, and the petition charged both. The minute order also states, in plural language, that Perry admitted "the terms and conditions of [p]robation." We would expect some limitation in the record if Perry intended his admission to be limited in the way he now suggests.

Perry also urges that, since his guilty plea to the underlying offense came before a preliminary hearing, and sentencing proceeded without a presentence report, the record lacks sufficient evidence of any nexus between his offense and prohibiting his use of medical marijuana. This premise, too, is faulty. As set out in the background part of this opinion, that very paucity of documentary evidence prompted counsel *on both sides* to make oral representations to the court about the pertinent facts of the charges, as well as various facts bearing on Perry's criminal and personal history, views, and acceptance of responsibility. Both sides clearly meant for the court to rely on their representations in lieu of a report, and raised no objections or corrections to the other's statements. Then the court stated in ruling that its "understanding of . . . the underlying facts" was based on victim letters and "what you both have said." Having induced the court to rely on the oral representations, and then acceded to the court doing so, Perry cannot complain now that they were unsworn or lacked a formal stipulation to be taken in lieu of evidence.

12

With those premises properly deflated, resolution of Perry's nexus arguments is straightforward. Taking first the underlying offense, the showing was that Perry showed up at work that morning in a "severely intoxicated" state, so intoxicated that Doe, as his supervisor, had to escort him home. On that car ride Perry began a series of threats that would include having her raped and killed by his friends, whom he acted as though he was calling on his cell phone. She was also brutally attacked physically and choked, was afraid for her life, and in the end was devastated emotionally by the threats and physical assaults. And while it is true that there was no information whether Perry had a frequent or chronic problem with intoxication, he obviously had a major problem that morning, with violent and devastating effects. There was no showing, in fact, that anything *besides* intoxication drove him to that abusive and violent state. And while Perry is correct to observe that we cannot tell from the record just what the intoxicating substance or substances were, the court could reasonably conclude that any kind of intoxication would have increased the risk, and thus that prohibiting marijuana use bore a sound nexus to the offense.

Alternatively, there was also a nexus to future criminality. Perry's points about the lack of evidence that he had a chronic or repeated intoxication problem hold more sway here, because it is possible to speculate—however unlikely it may be—that his attack on Doe was the product of an isolated, unprecedented episode of substance abuse. Putting that aside, however, it remains that Perry admitted to probation violations alleging that he tested positive for THC on August 29 and November 3, 2011, thus directly demonstrating a willingness to break the law through marijuana use. We are not impressed by his argument that this is not fair game because the authorization from Dr. Lenson he would later produce showed an issuance date of May 26, 2011, and expiration date of May 26, 2012, encompassing both of the alleged violation dates. He cites his attorney's statement at the December 21 admission hearing, about possible uncertainty in that probation in Marin County was satisfied with Perry having a medical marijuana authorization, whereas when he moved to Napa County, probation insisted on his having court approval. One problem with this excuse is that the court in Marin

13

County had forbidden possession or use of any "illegal substances, including prescribed marijuana, *unless specifically authorized by the court*." (Italics added.) Thus even if we could accept counsel's unsworn remarks as evidence, Napa County probation's position was the correct one; a mere authorization was not enough to avoid violating probation. Another problem with his excuse is that, by admitting the violation of probation, Perry forfeited any chance to assert that excuse.

The *Lent* test is satisfied on this record, and thus provides threshold discretion for the court to interfere with authorized medical marijuana use.

## IV. *Step Three Issues*

That brings us to step three under *Leal*. Finding discretion under the *Lent* test to interfere with a probationer's medical use of marijuana "does not mean that the court *must* impose an interfering condition, for *discretionary* action is, by definition, something permitted, not required." (*Leal*, *supra*, 210 Cal.App.4th at p. 843.) Discretion is abused when the determination is arbitrary or capricious, or exceeds the bounds of reason, all of the circumstances being considered. (*Ibid*.) "The step-three exercise of discretion is vital in limiting medical use of marijuana, for it entails a unique balance of competing public policies. On one hand, the step-one conclusion that a defendant has CUA authorization implicates a voter-compelled policy that qualified patients be allowed to alleviate medical problems through the use of marijuana. On the other hand, the step-two conclusion that the relationship of that lawful use to the crimes the defendant committed, or his or her future criminality, raises a competing policy consideration: the need to rehabilitate the defendant and protect the public during his or her release on probation. The resolution of these competing policies necessarily requires weighing the needs of one against the other before deciding whether and how much to limit the lawful conduct." (*Id*. at p. 844.) To repeat our earlier explication: "The requisite balancing contemplates a judicial assessment of medical need and efficacy based upon evidence: the defendant's medical history, the gravity of his or her ailment, the testimony of experts or otherwise qualified witnesses, conventional credibility assessments, the drawing of inferences, and perhaps even medical opinion at odds with that of the defendant's authorizing physician." (*Ibid*.)

14

Step three is the weakest link for Perry.  With the record showing a need to limit or prohibit marijuana use for his rehabilitation and for protection of the public, it was incumbent on him to show, as only he could, that he had a countervailing need to use marijuana for medical purposes.  Perhaps because he was acting as his own counsel and unfamiliar with evidentiary requirements, or perhaps not, his showing of need was exceedingly weak.  Accepting that his medical records for treatment of back pain established that he suffered from spondylolisthesis in his lower back, the degree of his discomfort was not established.  Perry did not submit declarations or testify to the matter.  His CUA authorization only established that one physician felt that he could derive "some unquantified 'benefit from the use of marijuana' (§ 11362.5, subd. (b)(1)(A)) to help alleviate" his back condition.[6]  (*Leal*, *supra*, 210 Cal.App.4th at p. 845.)  No evidence showed the degree of his discomfort, or even whether he had ever gotten any relief for it from marijuana, such as when he used it in admitted violation of probation.  Perry's unsworn statements at the hearing were not evidence.  Unlike the May 2009 sentencing for the underlying offense, there was no implicit understanding by the court and parties at this hearing that unsworn statements were to be accepted in lieu of evidence.

There was also no proof—just the non-evidence of his own statements—that Perry could not get effective relief from medications other than marijuana.  The material he printed from the Web on spondylolisthesis (assuming it was somehow subject to judicial notice) described the condition as often causing no suffering and, while sometimes problematic, "curable" by simply taking good care of oneself.  Another excerpt read, as to lower back pain:  "[T]here are some easy exercises with which you can easily treat the pain and reduce it up to a major margin.  The best treatment for the back pain is considered as the back stretching and body stretching exercises.  These exercises can give

---

[6]  Perry makes no effort to justify medical marijuana use to alleviate the "seasonal allergies" also diagnosed in Dr. Lenson's authorization, but in any event, Perry presented no evidence, medical records, or even unsworn statements, about that supposed condition.

an effective relief to the patient without any hap hazard [*sic*]." Medical records Perry furnished of a November 2011 appointment he had with Dr. Sadiq showed that he was instructed to do exercises, schedule an appointment with physical therapy, and take "Naproxen (NAPROSYN)" tablets twice a day as needed for pain. His December 2011 letter from Dr. Sadiq repeated that he had been referred to physical therapy and added that he had been "using NSAIDs for pain control." The court, responding to that letter and to Perry's (unsworn) claim of having lost medical coverage, observed that such anti-inflammatories, like Advil and Aleve, were surely less expensive than marijuana.

The court's implicit step-three finding that the need for medical marijuana was outweighed by the need for rehabilitation and protection of the public is overwhelmingly supported.

### V. *"Reasons" for the Decision*

The court's oral ruling was: "I'm going to deny your request. I'm just not satisfied with what you've presented here that there is a sufficient basis for me to allow you to consume medical marijuana during your probationary period. [¶] So the request is denied." Perry argues that this failed to satisfy section 11362.795, subdivision (a)(2), which provides: "The court's decision and the reasons for the decision shall be stated on the record and an entry stating those reasons shall be made in the minutes of the court." (See fn. 1, *ante*, for fuller context.)

The decision, but not reasons, are reflected in the court's minute order, and failure to include the reasons was certainly in breach of the provision. Whether the ruling as orally rendered failed to adequately state "reasons" may be debatable, as is the Attorney General's position that Perry's failure to raise any objection on this basis below waived the issue for appeal, but we need not decide. Any error or errors were harmless.

Generally, a court's failure to give adequate or proper reasons, in violation of statute, is subject to review for harmless error. (*People v. Osband* (1996) 13 Cal.4th 622, 729-730 [no reasonably probability a more favorable sentence would have been imposed in the absence of partly faulty reasons]; *People v. Price* (1991) 1 Cal.4th 324, 492 [not reasonably probable that the trial court would have chosen a lesser sentence had it known

16

that some of its reasons were improper]; contrast *People v. Bonnetta* (2009) 46 Cal.4th 143, 148-152 [no harmless error analysis for failure to set forth reasons, in the minutes. for dismissing a strike allegation in the furtherance of justice under Pen. Code, § 1385].)

Perry does not argue that error he raises is reversible per se but disagrees with the Attorney General's view that any error was harmless. He argues that lack of a complete statement of reasons "adversely impacted" him because it leaves us to "speculate exactly how his showing could be viewed as insufficient, which is precisely why the statute squarely places the onus on the trial court to specify the reasons for its decision." It is true that one reason for requiring a statement of reasons is to enable meaningful review (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1770), but as our analysis above shows, the record does not leave us to "speculate" what shortcomings the court found in Perry's showing. The evidentiary shortcomings were objectively clear, without need to wonder what subjective concerns, like credibility, might have further influenced the court. And finally, the existence of the court's comments at the hearing makes their lack of inclusion in the minutes harmless for review purposes.

We hold to be harmless any error or errors in the expression of reasons.

**DISPOSITION**

The order of January 6, 2012, denying Perry's second request to use medical marijuana while on probation is not shown to be an abuse of discretion, and the order is affirmed.

_____
Kline, P.J.

We concur:

_____
Lambden, J.

_____
Richman, J.