Filed 8/6/13  In re Joshua C. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Joshua C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Joshua C.,<br><br>        Defendant and Appellant. | A136438<br><br>(Del Norte County<br>Super. Ct. No. JDSQ-11-6048) |

Appellant Joshua C. was found by the juvenile court to have illegally possessed marijuana and was declared a ward of the court.  Joshua's continued illicit use of marijuana was revealed in several subsequent drug tests, resulting in multiple violations of his probation.  Joshua sought to modify the terms of his probation to allow use of marijuana for medicinal purposes.  Following an evidentiary hearing, the court denied the motion.  We conclude the court acted well within its discretion in doing so.  We also reject Joshua's claim of ineffective assistance of counsel and affirm.

## I.        BACKGROUND

On January 6, 2011, Joshua (then 14 years old) was discovered with marijuana and drug paraphernalia in his backpack on school grounds.  The backpack contained a zip lock bag holding 46.2 grams of marijuana, a small metal pipe with burned and unburned residue, a lighter, rolling papers, and a "Keef (Kief) grinder."  Joshua told a school official another student had put the items in his backpack and that he did not use

1

marijuana. Joshua's wallet, however, was decorated with pictures of marijuana leaves and Joshua's mother (Mother) reported that this was not Joshua's first involvement with marijuana.

On March 23, 2011, the Del Norte County Probation Department (Probation) filed a juvenile wardship petition pursuant to Welfare and Institutions Code section 602, subdivision (a), alleging that Joshua committed misdemeanor possession of more than 28.5 grams of marijuana (Health & Saf. Code, § 11357, subd. (c)).[1] On April 13, Joshua admitted the alleged crime.

According to the disposition report, Mother told Probation that Joshua suffered from attention deficit hyperactivity disorder (ADHD) and "minor" autism, and he had trouble controlling his anger. She had taken him off prescribed medication when he was about 12 years old. Joshua said he started smoking marijuana when his prescription medications were stopped and that he found marijuana to be more effective in controlling his behavior. It alleviated his mental health issues, anxiety and anger, and helped him sleep better at night. Probation opined that Joshua was inappropriately self-medicating with marijuana and should return to his prescription drugs and attend counseling. At the May 2011 disposition hearing, the court declared Joshua a ward of the court and placed him on probation in his parents' home. He was ordered to obey all laws and submit to drug testing.

On July 16, 2011, Joshua stole a bottle of alcohol from a Safeway grocery store and violated a local curfew for minors. On July 18 and 25, he failed to submit to drug testing. Probation filed a supplemental petition pursuant to Welfare and Institutions Code sections 602, subdivision (a) and 777 (July 27 Petition), alleging that Joshua had committed misdemeanor theft of alcohol from Safeway (Pen. Code, §§ 484, 488), misdemeanor violation of curfew (Crescent City Mun. Code, § 9.04.010), and misdemeanor possession of alcohol (Bus. & Prof. Code, § 25662), and violated the terms

---

[1] All statutory references are to the Health and Safety Code unless otherwise indicated.

of his probation by failing to provide urine samples on July 18 and July 25. Joshua admitted the charges. On July 26, Joshua violated the curfew imposed by his conditions of probation, and on August 8 he tested positive for marijuana. Probation filed another supplemental petition (August 15 Petition) alleging these violations of probation, which Joshua admitted in September.

*First Request for Permission to Use Medical Marijuana*

An October 2011 disposition report on the July 27 and August 15 Petitions states that Joshua had been prescribed medical marijuana to treat his ADHD. "[Mother] reports that she is [Joshua's] caregiver and eventually plans to learn to cook with the marijuana, but until then she has been providing marijuana to [Joshua] to smoke. . . . [S]he does not want to treat [Joshua's] ADHD with a stimulant, such as Ritalin . . . . She feels the side effects of taking Ritalin are too dangerous for [him]. However, [Joshua] is currently taking Wellbutrin to treat his depression which is considered a stimulant." Probation expressed serious concerns about Joshua's use of medical marijuana, citing information from the American Council for Drug Education that smoking marijuana is more carcinogenic than smoking tobacco, and that "marijuana use in teens is particularly damaging to their learning capabilities and impacts the juveniles['] ability to master interpersonal coping skills or make appropriate life-style choices." Probation noted that Joshua's original offense involved marijuana possession on school grounds and that only three of his 17 drug tests while on probation were clean.

In a written response to the disposition report, Mother wrote that Joshua was "severely depressed for which we are treating with the help of his therapist and medication. He has ADHD, insomnia and high anxiety which are all part of the package. Our choice, based on his behavior, our family and medical professionals to treat these is medical use of [cannabis]." She specifically requested a one-month trial on medical marijuana under her personal supervision: "I will keep a log of how and when I give it to him. I will not allow him to have any [cannabis] during school hours. Evenings seem best so far. He is sleeping well, staying home with his family and doing his school work

3

without much provocation. His anger has subsided considerably. I will also submit my log to [Probation] weekly to make sure it coincides with his weekly urine test levels."

At an October 12, 2011 disposition hearing, the court (Hon. Philip Schafer) denied her request. The court continued Joshua as a ward of the court, continued him in his parents' home, and, in addition to all previous orders, directed Joshua not to possess or consume marijuana in any form. He was also ordered to participate in alcohol and drug counseling. The appellate record does not include a reporter's transcript of this hearing.

On December 12, 2011, Probation filed another supplemental petition alleging Joshua violated his probation by testing positive for marijuana on November 22 and 29, 2011. On December 14, 2011, Joshua admitted the allegations. During the hearing, Mother reported that Joshua was doing very well, getting good grades, and attending counseling and drug and alcohol treatment, and that he had "cut off" several people, who apparently were bad influences on him. The court ordered Joshua to spend 48 to 96 hours in juvenile hall for the dirty drug tests and referred him to drug court. On January 13 and 20, February 24, March 16, and April 6 and 27, 2012, Joshua was again ordered to serve time in juvenile hall for testing positive for THC (marijuana).

*Second Request for Permission to Use Medical Marijuana*

On May 2, 2012, Joshua moved to modify the terms of his probation to allow him to use medical marijuana. In support of the motion, he submitted several documents: a physician's medical marijuana recommendation (MediCann Physician's Statement); a letter by his therapist, psychiatric social worker Vincent Cappello; and declarations by Joshua and his mother. The MediCann Physician's Statement stated in its entirety: "This letter is to verify that I am the attending physician for Joshua [C.] regarding the therapeutic value of medical marijuana for him/her. Additionally, this letter verifies that he/she has been diagnosed with a serious medical condition and that the medical use of marijuana is appropriate for that serious medical condition. [¶] This letter is a part of the patient's permanent record." The physician's statement was signed by Mark Altchek, M.D., and provided the doctor's license number, statement date (Sept. 3, 2011), "Time Period Covered" (until Sept. 3, 2012), clinic location (Eureka), patient identification

4

number, and patient's date of birth. The Cappello letter stated that "Current literature review has supported the use of marijuana to treat A.D.H.D. in lieu of stimulant medication." Joshua's and Mother's declarations described Joshua's medical conditions (mild autism, ADHD, pain from a 2011 accident where he was struck by an automobile, and depression), the ineffectiveness and adverse side effects of traditional medication he had taken for these conditions (Adderall, Wellbutrin, Lexapro and others, which caused insomnia, intestinal disorders, nausea, and irritability), and the positive effects he had experienced on marijuana (ability to relax, focus and sleep well at night; greater self control and less anger and depression). These improvements occurred under a regime in which Mother kept possession of the marijuana and gave Joshua one gram of the drug after school and one gram at bedtime. Mother promised to continue this regime and to ensure that Joshua did not go to school under the influence of marijuana; did not go to a public place under the influence except in the company of his parents; did not share the marijuana with anyone else.

On May 11, May 25, June 8, June 22, July 6 and July 20, 2012, Joshua was again ordered to spend time in juvenile hall after he tested positive for marijuana. The court, however, agreed to hold a hearing on whether to modify the terms of Joshua's probation to allow him to use medical marijuana. The court advised Joshua, "I can almost guarantee you that if I don't have a doctor's testimony that I find convincing I'm not going to be granting the motion."

After numerous continuances, the hearing was finally held on August 7. Joshua's counsel was unable to get Dr. Altchek to testify, and called only Cappello and Mother to testify at the hearing. Cappello testified that he had 31 years of experience counseling children and adolescents, and was very familiar with the literature on medical marijuana and adolescents, having started his career working with teenagers with dual diagnoses (mental health and substance abuse). Marijuana, he testified, "can compound a mental illness or . . . help mental illness." For people with Joshua's diagnosis—ADHD with racing brain syndrome—treatment is paradoxical: stimulants help them calm down and

5

concentrate. Similarly, marijuana, which typically makes people tired or "spacey," helps people with ADHD and racing brain syndrome concentrate.

Cappello cited research by pediatrician Dr. Claudia Jensen of "USC," by Kort Patterson, and by the University of California at Berkeley as reported in *The New York Times*. On further questioning by both the prosecutor and court, Cappello was unable to describe in any detail the research underlying the reports he cited. The Jensen paper Cappello cited appeared to be nothing more than an essay written by a pediatrician about her own children's use of marijuana to treat ADHD, published in the Cannabis Culture Forums website, and not in a peer-reviewed medical journal. Cappello did not know whether Dr. Jensen had conducted any research into the topic. The Patterson article appeared only on Patterson's own website and provided little information about Patterson's credentials. Cappello also was unable to describe in any detail the research discussed in *The New York Times* news article.

During his testimony, Cappello also acknowledged that: he was not a medical doctor and could not prescribe medication; he did not have any other minor patients using medical marijuana; opposing views exist in the research literature on the value of using medical marijuana to treat ADHD or other conditions in adolescents; the information he had cited was very recent; he had never before recommended medical marijuana for an adolescent patient; and it might be impossible to conduct scientifically valid research on medical marijuana use by adolescents based on a large controlled study because of legal restrictions. Finally, Cappello said he recommended marijuana for Joshua because he thought it was worth a try: "I can't tell you exactly if it's going to work, . . . but I would say let's give this a chance."

When the court asked why Joshua's primary care physician had not prescribed Joshua medical marijuana, Cappello said the doctor was not licensed to do so. "[I]t's a referral process almost like to a specialist. [¶] . . . [¶] . . . [T]hey have special doctors that they all go to. . . . I don't know exactly how it works . . . ." The court also asked if any medications other than medical marijuana could be used to treat Joshua's problems.

6

Cappello said he did not know if Joshua had tried a newly available antidepressant drug, Straterra, with no stimulant component.

Mother testified she wanted permission to put Joshua on a trial run of small doses of marijuana that would maintain his THC levels at an "even keel." When they did that for a while after they first got the recommendation, his symptoms went away: "He no longer shook. He no longer had heart palpitations. He slept normally. He wasn't sweating profusely. He could talk. He could articulate. He could focus. [¶] . . . [H]e was pleasant. He was not angry. I mean, all the physical stuff, he could eat. All the other medications that he took, he couldn't eat. He was throwing up all the time. He was sweating profusely." Although Joshua continued to use marijuana illicitly after the court denied the request to allow medical marijuana, his use was sporadic and thus not effective. As to her comment at the December 14, 2011 hearing that Joshua was doing very well, Mother testified that Joshua had made tremendous progress in the previous year, but she did not mean to imply that he had no problems whatsoever at that time.

The court (Hon. William H. Follett) denied the motion. "When this first came before me, . . . I indicated a great deal of skepticism about the efficacy of minors using medical marijuana. I indicated that it was contrary to all of the training that I had received as a juvenile court judge . . . that it has an effect on the development of [the adolescent] brain that's . . . more detrimental than would be safe for an adult. [¶] Nevertheless, the mother . . . made just a very compassionate and passionate plea to the Court. And I had indicated that I would reconsider the judge's prior ruling . . . , but I thought I made pretty clear, I wanted to hear from the doctor who recommended it . . . . [¶] . . . I did not hear from the doctor today. [¶] . . . [¶] . . . [I]f I would have had testimony from the doctor who prescribed it that indicated that this really was necessary and not just conclusions, but gave me facts and reasons for it, I would have felt different. I also would have been much more likely to consider the testimony of a primary care physician for Josh, rather than somebody he went down to and simply paid some money and whose business it is to write recommendations for marijuana. No indication of why. I don't know what records he considered."

7

The court also stated, "I was underwhelmed, to say the least, with the testimony of Mr. Cappell[o] as being an expert who would convince me to change my mind. In fact, he confirmed that . . . the great body of literature is against allowing minors to use marijuana. [¶] Some of the testimony [Cappello] gave today was fantastic in my mind . . . which calls into question his credibility. He told me that he was relying upon the literature. He told me it was published in peer reviewed journals which appears not to be the case. . . . [¶] . . . [¶] . . . [A]nother item that Mr. Cappell[o] testified to that . . . is not true [is] that [a physician must] have to have some sort of special qualifications to write a recommendation for marijuana."

In sum, "No clear benefit has been established to this Court to using marijuana. What I have are the anecdotal statements from the family . . . . Nobody can really point to me with any scientific basis why marijuana would be helpful to the ADD. [¶] I'm also very, very conscious of the fact that Josh has a history of abusing substances. . . . [¶] . . . [¶] He has frankly not been truthful to us about his use of marijuana in the past. . . . [¶] . . . I've never been told what would be a therapeutic amount of marijuana in a drug test. . . . [¶] . . . I have a great deal of sympathy for the parents and what they're trying to do. I'm convinced that they are trying to do what's best for Josh. But . . . as his judge, it appears to me that it is a mistake to allow him to use marijuana . . . . [¶] So the request to modify his probation terms to allow him to use marijuana is denied."

## II.   DISCUSSION

A.   *Denial of Motion to Modify Terms of Probation*

Joshua argues the trial court abused its discretion in denying his motion to modify the terms of his probation to allow him to use medical marijuana. We find no abuse of discretion and affirm.

"[Welfare and Institutions Code s]ection 730, subdivision (b) authorizes the juvenile court to 'impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced.' A juvenile court enjoys broad discretion to fashion conditions of probation for the purpose of rehabilitation and may even impose a condition

8

of probation that would be unconstitutional or otherwise improper so long as it is tailored to specifically meet the needs of the juvenile.  [Citation.]  That discretion will not be disturbed in the absence of manifest abuse.  [Citation.]"  (*In re Josh W.* (1997) 55 Cal.App.4th 1, 5.)

        1.      *Standard for Prohibiting Medical Marijuana Use as Term of Probation*

In 1996, the California electorate adopted the Compassionate Use Act (CUA; § 11362.5), which provides in relevant part:  "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."  (§ 11362.5, subd. (d).)  The CUA places no express age restrictions on "patients" who may possess or cultivate marijuana with a physician's approval (medical marijuana) and neither the prosecutor nor the trial court questioned whether it applies to Joshua.

The CUA does not expressly prohibit courts from imposing conditions of probation barring the use of medical marijuana.  Its declaration of purpose states that patients have a right to use medical marijuana and should not be subjected to criminal sanction for doing so.  (§ 11362.5, subd. (b)(1)(A), (B).)  An early appellate court decision by the Third District, however, held that trial courts retain their traditional discretion to impose probation terms that prohibit lawful conduct such as medical marijuana use in appropriate circumstances.  (*People v. Bianco* (2001) 93 Cal.App.4th 748, 752 (*Bianco*).)  Under the controlling law, "[a] condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .'  [Citation.]"  (*People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*), fn. omitted; see *Bianco*, at p. 752.)

The two-judge majority in *Bianco* reasoned that, on the facts of that case, the prohibition against all marijuana use was valid because it was reasonably related to the crime—unlawful cultivation of marijuana without a physician's authorization and future

9

criminality—the diversion of marijuana for nonmedical purposes and substance abuse, both of which were particular risks for the defendant based on the factual record.[2] (*Bianco, supra,* 93 Cl.App.4th at p. 754.)  One judge, however, disagreed on this point, reasoning, "Balancing the evils—chronic pain versus the possibility of future possession of marijuana for purposes other than compassionate use—it would be unreasonable to bar defendant from lawfully possessing marijuana for medicinal purposes simply out of concern that he also may possess marijuana for nonmedicinal purposes, a possibility that is adequately addressed by the threat of future criminal prosecution." (*Id.* at p. 756 (conc. opn. of Scotland, P.J.).)  A later decision by the Third District similarly held, on the facts of that case, that a probation term prohibiting the use of medical marijuana was not justified under *Lent*:  "A probation condition . . . must be 'reasonably related to the crime of which the defendant was convicted or to future criminality.'  ([*Lent*, at p.] 486.)  However, it ordinarily cannot be said that the treatment of an illness by lawful means is so related." (*Tilehkooh, supra,* 113 Cal.App.4th at p. 1444, parallel citation omitted.)  The court observed that "here, there is no claim that [the defendant's] conduct endangered others or that he diverted marijuana for nonmedical purposes.  [Citation.]" (*Id.* at pp. 1437.)[3]

---

[2] The court also held that the use of medical marijuana, although lawful under state law, violated the condition that the probationer obey all laws because it remained illegal under federal law.  (*Bianco, supra,* 93 Cal.App.4th at p. 753; see also *id.* at p. 755 (conc. opn. of Scotland, P.J.) [concurring on this ground].)  Two years later, however, another panel of the Third District disagreed:  "[S]tate courts do not enforce the federal criminal statutes. . . . [¶] . . . The People . . . seek to enforce the state sanction of probation revocation which is solely a creature of state law.  ([Pen. Code,] § 1203.2.)  The state cannot do indirectly what it cannot do directly.  That is what it seeks to do in revoking probation when it cannot punish the defendant under the criminal law." (*People v. Tilehkooh* (2003) 113 Cal.App.4th 1433, 1445–1446 (*Tilehkooh*).)

[3] *Tilehkooh* also faulted the trial court's ruling that the defendant had not established a CUA "defense" to the probation condition because he had not established the elements of a medical necessity defense, including a showing that defendant was seriously ill and had no treatment alternatives.  (*Tilehkooh, supra,* 113 Cal.App.4th at pp. 1439–1441; see *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1160 [elements of medical necessity defense].)  "The medical necessity defense is not the measure of the

In 2003, the Legislature enacted legislation, the Medical Marijuana Program (MMP; § 11362.7 et seq.), that at least tangentially addresses the issue before us. The core of the MMP is a voluntary identification card scheme, which allows medical marijuana patients and their caregivers to avoid unnecessary arrest in addition to the CUA's protection against conviction for marijuana possession and cultivation offenses. (*People v. Kelly* (2010) 47 Cal.4th 1008, 1014.) As more directly relevant here, the MMP also establishes a procedure whereby a probationer can request permission to possess or cultivate medical marijuana during the term of probation: "(1) Any criminal defendant who is eligible to use marijuana pursuant to [the CUA] may request that the court confirm that he or she is allowed to use medical marijuana while he or she is on probation or released on bail. [¶] (2) The court's decision and the reasons for the decision shall be stated on the record and an entry stating those reasons shall be made in the minutes of the court. [¶] (3) During the period of probation or release on bail, if a physician recommends that the probationer or defendant use medical marijuana, the probationer or defendant may request a modification of the conditions of probation or bail to authorize the use of medical marijuana. [¶] (4) The court's consideration of the modification request authorized by this subdivision shall comply with the requirements of this section." (§ 11362.795, subd. (a); hereafter § 11362.795(a).)

This appellate court district first addressed the propriety of a probation condition prohibiting use of medical marijuana after the MMP was enacted. (*People v. Moret* (2009) 180 Cal.App.4th 839.) It was a fractured decision. The lead opinion upheld a probation condition prohibiting medical marijuana use on the grounds of waiver, reasonableness under the *Lent* test, and the implication in section 11362.795(a) that the trial court retained the discretion to prohibit the use of marijuana during probation despite the CUA. (*Moret,* at pp. 844–846, 850, 853.) The concurring justice relied solely on the

_____

right to obtain and use marijuana for medical purposes granted by section 11362.5. . . . [¶] Although section 11362.5 affords a defense to 'seriously ill Californians' . . . , it includes within that category . . . '*any other illness for which marijuana provides relief.*' ([§ 11362.5, s]ubd. (b)(1)(A); italics added.)" (*Tilehkooh*, at p. 1441.)

11

ground of waiver. (*Id.* at pp. 857–858 (conc. opn. of Richman, J.).) The dissenting justice wrote there was no voluntary waiver, and the record did not support imposition of the condition. (*Id.* at pp. 860–862 (dis. opn. of Kline, P.J.).) A few years later, the same division of this district reached a unanimous panel decision that set forth a three-step framework for evaluating probation conditions that prohibit the use of medical marijuana: "First, we examine the validity of any CUA authorization; second, we apply the threshold *Lent* test for interfering with such authorization; and third, we consider competing policies governing the exercise of discretion to restrict CUA use." (*People v. Leal* (2012) 210 Cal.App.4th 829, 837 (*Leal*).)

In the meantime, two other districts addressed the issue of probation conditions that prohibit the use of medical marijuana. The Second and Fourth Districts both held that *Lent, supra,* 15 Cal.3d 481, and section 11362.795(a) supported the conclusion that courts retain their discretion to prohibit medical marijuana use as a term of condition. (*People v. Brooks* (2010) 182 Cal.App.4th 1348, 1352; *People v. Hughes* (2012) 202 Cal.App.4th 1473, 1480–1481 (*Hughes*).) In both cases, the courts held that the probation conditions at issue in those cases (which barred medical marijuana use) were reasonably related to the underlying offenses and to future criminality because the defendants in the cases had attempted to mask their illegal activity as CUA-protected activity. (*People v. Brooks*, at p. 1353; *Hughes*, at 1481.) *Hughes*, however, held that the trial court had erred, albeit harmlessly, for "focus[ing] on whether defendant had a need to use medical marijuana . . . [and] question[ing] the palliative efficacy of marijuana and . . . [whether] marijuana is . . . the only medication that could resolve defendant's ailments and pain. . . . The trial court's concerns effectively question[ed] the wisdom of allowing marijuana to be used for medicinal purposes. That issue was resolved in 1996 when voters of this state passed the CUA." (*Hughes*, at p. 1481.)

In sum, all of the courts that have addressed the issue in published decisions have concluded that trial courts retain the discretion to prohibit the use, possession and cultivation of marijuana even if such use is otherwise lawful under the CUA, as long as they follow the analytical framework of *Lent, supra,* 15 Cal.3d 481. Some decisions have

raised questions about whether and under what circumstances it is appropriate for a court to question the wisdom of a defendant's use of medical marijuana in light of the electorate's adoption of the CUA. *Leal* has provided the most detailed guidance on this issue in step three of its three-step approach to evaluating the validity of probation conditions that bar the use of medical marijuana:

"[L]imiting medical use of marijuana . . . entails a unique balance of competing public policies. On one hand, the step-one conclusion that a defendant has CUA authorization implicates a voter-compelled policy that qualified patients be allowed to alleviate medical problems through the use of marijuana. On the other hand, the step-two conclusion that the relationship of that lawful use to the crimes the defendant committed, or his or her future criminality, raises a competing policy consideration: the need to rehabilitate the defendant and protect the public during his or her release on probation. The resolution of these competing policies necessarily requires weighing the needs of one against the other before deciding whether and how much to limit the lawful conduct.

"That balance will vary widely from case to case. In an extreme case of need for medical marijuana, for example, the drug might be an effective and least-harmful way to alleviate debilitating suffering from end-stage pancreatic cancer. [Citation.] . . . Far more commonly, of course, the rehabilitative/protective need could outweigh a lesser medical need, or one that could be efficaciously met by alternative means.

"We stress that this third step balancing of competing needs does not allow a court to question the wisdom of voters or the validity of an unchallenged card or the underlying medical authorization. The requisite balancing contemplates a judicial assessment of medical need and efficacy based upon evidence: the defendant's medical history, the gravity of his or her ailment, the testimony of experts or otherwise qualified witnesses, conventional credibility assessments, the drawing of inferences, and perhaps even medical opinion at odds with that of the defendant's authorizing physician." (*Leal, supra,* 210 Cal.App.4th at p. 844; see also *People v. Beaty* (2010) 181 Cal.App.4th 644, 662 ["tension between Prop. 36 and [the CUA] requires a balancing act for the courts, probation departments, and drug treatment programs," and "any restriction of [medical

marijuana] use must reasonably be related to [the defendant's] specific offense and based on medical evidence addressing [his or her] medicinal needs"].)

The case before us presents an additional, and significant, element. The appellant seeking to use medical marijuana is a minor. The general principles governing probation conditions in juvenile delinquency cases grant juvenile courts greater discretion than trial courts enjoy in adult probation cases. (*In re Tyrell J.* (1994) 8 Cal.4th 68, 81, overruled on other grounds by *In re James P.* (2006) 40 Cal.4th 128, 130; *In re Binh L.* (1992) 5 Cal.App.4th 194, 203.) In juvenile court, a grant of probation is not an act of leniency, but a dispositional order made in the minor's best interest. (*In re Tyrell J.*, at p. 81.) The court must consider not only the circumstances of the offense, but also the minor's entire social history. (*Ibid.*) The court must also consider the legislative policies of the juvenile court system, which are to protect the safety of the public and the minor, to preserve the minor's family ties whenever possible, and to address the problem of juvenile delinquency at its inception when minors are more amenable to rehabilitation, intervening when minors show early signs of delinquency such as truancy, illiteracy, and drug and alcohol abuse. (*In re Jason J.* (1991) 233 Cal.App.3d 710, 714–715, overruled on other grounds by *People v. Welch* (1993) 5 Cal.4th 228, 237; *In re Kacy S.* (1998) 68 Cal.App.4th 704, 711; see Welf. & Inst. Code, § 202, subd. (a); Stats. 1989, ch. 1117, § 1, p. 4113.) Moreover, a juvenile offender's constitutionally protected liberty interest is qualitatively different from that of an adult probationer. (*In re Todd L.* (1980) 113 Cal.App.3d 14, 20.) Thus, a probation condition that might be unconstitutional or improper for an adult may be permissible for a minor. (*In re Tyrell J.*, at p. 81.)

We therefore apply a *Leal* review of the probation condition here in the context of the juvenile court's broader discretion.

2.    *Application to this Case*

The first two steps of the *Leal* analysis are relatively simple to apply in this case. First, Joshua had obtained a physician's letter stating that marijuana was appropriate treatment for his medical condition. Second, Joshua's offenses involved the possession or use of marijuana or alcohol, another intoxicating substance that is unlawful for minors

14

to consume or possess. This is not a case like *Tilehkooh* where "there [was] no claim that [the defendant's] conduct endangered others or that he [used] marijuana for nonmedical purposes." (*Tilehkooh, supra,* 113 Cal.App.4th at p. 1437.) Joshua was found with 46.2 grams of marijuana in his backpack on school grounds, raising the possibility that other minors might access the marijuana through sales, sharing or theft. Joshua initially denied use of marijuana at all, but later admitted personal use. He did not claim that his use was limited to small doses designed solely to treat his medical conditions. Joshua also committed theft related to his illegal possession of alcohol. Prohibiting further marijuana use (as well as the use of alcohol and all other controlled substances) was therefore directly related to Joshua's offenses and to the risk of future criminality, i.e., future illicit drug use or sale or related crimes.

The more difficult task before the juvenile court was the third step of the *Leal* analysis, which required the court to balance the voter-adopted state policy protecting the medical use of marijuana against the juvenile justice system's goals of rehabilitation and protection of society. As *Leal* acknowledges, in this context the court was entitled to assess the weight of the policy protecting medical marijuana use in the particular circumstances of this case: that is, how important was it for Joshua in particular to have access to medical marijuana to treat his particular medical conditions? (*Leal, supra,* 210 Cal.App.4th at p. 844.) And in the context of a juvenile delinquency disposition order, the court was free to consider the effect of medical marijuana on Joshua's general social development, not only his potential criminal behavior.

Despite having advised Joshua's counsel in advance that it was unlikely to grant the motion without such evidence, no prescribing or treating physician testified regarding Joshua's need for medical marijuana and the physician's statement in the record included no information specific to Joshua's medical conditions. As the People note, the evidence did not even show that the physician recommending it actually examined Joshua. The court was entitled to draw negative inferences from this lack of evidence. (See *People v. Mower* (2002) 28 Cal.4th 457, 464 [when CUA is raised as a defense to marijuana possession or cultivation charge at trial, defendant has burden of establishing facts

15

underlying the defense].)  Moreover, the court was entitled to consider the fact, recognized in *Leal*, that the CUA is subject to abuse and that not all persons holding CUA recommendations have a legitimate need for medical marijuana.  (*Leal, supra,* 210 Cal.App.4th at pp. 838–839.)  The court reasonably found the testimony of psychotherapist Cappello, who was not a physician, was not credible on the issue of whether there was a scientific basis for recommending medical marijuana as a treatment for Joshua's medical conditions.  It was apparent that Cappello grossly overstated the factual foundation for his testimony.  He admitted that, even under his understanding of the scientific literature, the value of medical marijuana in treating ADHD was only a recent and disputed proposition.  He also admitted that the drug Straterra was an untried potential treatment for Joshua's conditions.  Cappello acknowledged research demonstrating that marijuana use was generally harmful to adolescent development.  Thus, the juvenile court could reasonably conclude that there was little or no evidence that medical marijuana was an effective treatment for Joshua's medical conditions and did not pose a risk of adverse side effects, or that medical marijuana was so superior to other available treatments that it should be allowed despite its risks.

The court had also before it an approximately one-and-one-half-year record of Joshua's persistent illicit marijuana use as shown by his arrests and drug test results.  His initial arrest was for possession of 46.2 grams of marijuana, far in excess of the two-gram daily dosage he later claimed was useful in treating his medical conditions.  He either failed to test or he tested positive for marijuana in July, August and November 2011 and at least once a month from January to July 2012.  That is, he continued to use marijuana even when ordered not to use the drug and not only as a medical treatment under his mother's supervision.  Mother could not account for Joshua's access to marijuana during much of this period.  She acknowledged he was using it sporadically and in doses greater than two grams.  These facts support an inference that Joshua was using marijuana not simply for self-medication of his ADHD and other mental health challenges, but for reasons more typical of adolescents using the drug.  Moreover, Joshua's substance use was related to criminal behavior, including the possession and possible sale or sharing of

16

marijuana on school grounds and the theft of alcohol from a grocery store.  The juvenile court further reasonably concluded that Joshua was at risk of addiction to or abuse of marijuana, and that continued marijuana use could adversely affect his development and possibly lead to further criminal or antisocial behavior

The court showed a sensitivity toward Joshua's challenges and strong sympathy toward his parents' sincere attempts to help treat their son's underlying medical conditions.  That is, the record amply demonstrates that the court took seriously its charge to balance the policy behind the CUA against the policy behind rehabilitation and societal protection in the juvenile justice system.  The court denied Joshua permission to use medical marijuana not because it flatly disagreed with the medical use of marijuana among adolescents, but because it was convinced that marijuana use in Joshua's particular case would impair rather than foster his rehabilitation and would risk rather than help protect community safety.  The court acted well within its discretion in reaching these conditions.

B.     *Ineffective Assistance of Counsel*

Joshua further argues, in the event this court concludes that he failed to establish his medical need for marijuana at the August 7, 2012 hearing, that he received ineffective assistance of counsel at the hearing.  When an ineffective assistance claim is raised on direct appeal, we will reverse the conviction only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his conduct.  (*People v. Frye* (1998) 18 Cal.4th 894, 979–980, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.)  We conclude he has failed to establish such a claim.

Joshua first faults his attorney for failing to introduce his medical marijuana card[4] at the hearing, citing *Leal*'s comment that such a card is prima facie evidence of CUA

_____

[4] Joshua does not cite to anything in the record that demonstrates he possessed a medical marijuana card issued pursuant to section 11362.71, the specific type of evidence discussed in Leal.  (*Leal, supra,* 210 Cal.App.4th at p. 839; see also *Moret*, *supra*, 180 Cal.App.4th at pp. 870–871 (dis. opn. of Kline, P.J.).)  Instead, the record includes

protection and satisfies step one of its three-part test. (*Leal, supra,* 210 Cal.App.4th at p. 839.) However, as noted *ante*, nothing in the court's ruling suggests that Joshua's motion was denied on the ground that he failed to establish that he qualified for CUA protection. Instead, the court ruled that the evidence supporting medical marijuana use was outweighed by evidence that continued use of marijuana would be harmful to Joshua and would impede his rehabilitation. That is, the court denied the motion under the principles articulated in step three, not step one, of the *Leal* analysis.

Joshua also faults his attorney for failing to subpoena Dr. Altchek or another physician who could testify about Joshua's need for medical marijuana. Nothing in the record, however, demonstrates that Dr. Altchek, if compelled to testify under subpoena, would have provided testimony beneficial to Joshua or that beneficial testimony of some other physician was available. The record indicates that Joshua's counsel attempted to contact Dr. Altchek but encountered resistance. There are obvious potential tactical reasons for a decision to not subpoena Dr. Altchek. His testimony might have been less persuasive than Joshua's testimony. Dr. Altchek's testimony might also have been subject to damaging impeachment, for example about his lack of familiarity with Joshua and his medical conditions or about the manner in which he conducted his practice with MediCann.

In sum, Joshua has failed to establish a claim for ineffective assistance of counsel on direct appeal because the record on appeal does not affirmatively disclose that counsel had no rational tactical purpose for his conduct.

### III.   DISPOSITION

The juvenile court's August 7, 2012 order denying Joshua C.'s motion to modify the terms of his probation is affirmed.

---

Joshua's MediCann Physician's Statement. Although this statement does not appear to have been formally introduced into evidence at the hearing, it was attached as an exhibit to Joshua's motion and reference to it in the court's ruling indicates that the statement was taken into consideration as evidence.

_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Simons, J.